## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

Neisa Ortega; and N.Z. by her next friend Neisa Ortega,

          Plaintiffs,

          v.

United States Customs and Border Protection; CBP Officers Doe 1–13; Supervisory CBP Officers Doe 1–3; CBP Commissioner Troy A. Miller, in his official capacity; United States Department of Homeland Security; DHS Secretary Alejandro Mayorkas, in his official capacity; and the United States of America,

          Defendants.

Civil Action No. 1:21-cv-11250

**COMPLAINT FOR INJUNCTIVE, COMPENSATORY, AND DECLARATORY RELIEF**

**DEMAND FOR JURY TRIAL**

## INTRODUCTION

Since April 2019, Customs and Border Protection ("CBP") officers at Boston Logan Airport ("BOS") have assaulted and degraded Plaintiff Neisa Ortega repeatedly, physically penetrating her vagina with their hands three separate times. During these body cavity searches, CBP officers separated Ms. Ortega from her 14-year old daughter, Plaintiff N.Z., for hours, during which neither was given information as to the whereabouts of the other. Ever since, Ms. Ortega has been haunted by the memories of CBP's small secondary inspection room, the anxiety and fear she felt when separated from her child, and the feeling of being sexually violated when CBP officers repeatedly penetrated her vagina. CBP's repeated detentions and assaults have led to severe physical and mental trauma for Ms. Ortega and her daughter.

CBP's assaults of Ms. Ortega began in April 2019, when Ms. Ortega and her young daughter, Plaintiff N.Z., were on their way home from an otherwise unextraordinary trip. Upon Plaintiffs' arrival at BOS, CBP officers detained Ms. Ortega and N.Z. in secondary inspection for hours. During the detention, CBP officers searched N.Z. and Ms. Ortega's luggage and phones and pointedly ridiculed them about the contents. Ms. Ortega was then separated from N.Z. for several hours, during which CBP officers refused to answer Ms. Ortega and N.Z.'s repeated inquiries about each other's whereabouts. Ms. Ortega was further violated when CBP officers forced her to undress and expose herself for a visual and penetrative search of her vagina and anus. CBP officers then subjected Ms. Ortega to a physically intrusive and sexually traumatizing body cavity search. Minutes later, CBP officers searched Ms. Ortega a second time, using their hands to spread apart her vagina. After completing two degrading and violative body cavity searches, CBP finally released Ms. Ortega and her daughter.

After the events in April 2019, Ms. Ortega hoped CBP's humiliating and assaultive behavior would stop, especially because CBP did not find any illegal substance on her body. But CBP's behavior continued. Since April 2019, CBP officers have detained, searched, and degraded Ms. Ortega *three additional times*.

In September 2019, Ms. Ortega was detained, separated from her travel companion, questioned for a prolonged period, and subjected to two pat downs. In March 2020, CBP again stopped and questioned Ms. Ortega and searched her private belongings. Both times, CBP officers found no evidence of wrongdoing. But still, the invasive and violative searches continued.

In August 2020, Ms. Ortega and N.Z. travelled together again. Once again, officers separated Ms. Ortega from her daughter. Once again, CBP assaulted Ms. Ortega by conducting

two separate, vaginally penetrative searches over the course of hours. Once again, they found nothing.

The individual CBP officers who searched and seized Ms. Ortega and N.Z. had no legal basis for their behavior. Moreover, the fact that CBP's April 2019 searches of Ms. Ortega revealed no evidence of drugs or other contraband only reinforced that they had no reasonable suspicion for any of the subsequent searches. Further, the CBP officers who detained and searched Ms. Ortega failed to follow CBP's own internal guidance and instructions on searches and seizures. In particular, CBP officers are prohibited from performing body cavity searches, including vaginal cavity searches. Vaginal cavity searches may **only** be conducted by medical practitioners at a medical facility and only in the most exceptional of circumstances.

Ms. Ortega and N.Z. fear that every time they travel, they will be forced into a small room and abused by CBP officers who rely on scant to no information to justify their illegal behavior. Ms. Ortega and N.Z. bring this action to hold CBP and its officers accountable for their horrific and unlawful actions, and so that they can stop living in fear.[1] They request (1) compensation for the federal government's tortious acts under the Federal Tort Claims Act, 28 U.S.C. § 1346; (2) damages for CBP officers' violations of Ms. Ortega and N.Z.'s Fourth and Fifth Amendment Rights; and (3) declaratory and injunctive relief against the Department of Homeland Security ("DHS"), CBP, and its officers.

---

[1] Unfortunately, Plaintiffs are not alone in experiencing harassment and humiliation at the hands of CBP. *See* Susan Ferris, *'Shocked and Humiliated': Lawsuits Accuse Customs, Border Officers of Invasive Searches of Minors, Women*, CENTER FOR PUBLIC INTEGRITY (Sept. 12, 2018), https://publicintegrity.org/inequality-poverty-opportunity/immigration/shocked-and-humiliated-lawsuits-accuse-customs-border-officers-of-invasive-searches-of-minors-women/ (published in partnership with the *Washington Post*).

## JURISDICTION AND VENUE

1.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331. Plaintiffs' claims arise under the Constitution and laws of the United States of America.

2.  This Court has authority to issue declaratory and injunctive relief under 28 U.S.C. § 2201 and § 2202, Rules 57 and 65 of the Federal Rules of Civil Procedure, and its inherent equitable powers.

3.  This Court has subject matter jurisdiction over Defendant the United States for the tortious actions of federal employees pursuant to 28 U.S.C. § 1346(b)(1).

4.  Plaintiffs have exhausted their administrative remedies under the Federal Torts Claims Act. They filed an administrative complaint against the U.S. Department of Homeland Security and U.S. Customs and Border Protection on January 19, 2021.

5.  On June 17, 2021, CBP denied the claim in full.

6.  On March 30, 2021, DHS closed the complaint.

7.  Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) because the incidents giving rise to this action occurred in this district.

## PARTIES

### *Plaintiffs*

8.  Plaintiff Neisa Ortega is a forty-five-year-old lawful permanent resident of the United States who resides in Massachusetts.

9.  Plaintiff N.Z. is Ms. Ortega's minor daughter and is a United States citizen who resides with her mother in their home in Massachusetts.

### *Defendants*

10. Defendant Customs and Border Protection ("CBP") controls U.S. ports of entry, including Boston Logan International Airport ("BOS").

11. Defendants CBP Officers Doe #1 and #2, are female CBP officers on shift on or about April 27, 2019, at BOS who conducted multiple body cavity and strip searches of Ms. Ortega, and who participated in her detention and questioning. The identities of CBP Officers Doe #1 and #2 are currently unknown to Plaintiffs.

12. Defendants CBP Officers Doe #3 – #7, are CBP officers on shift on or about April 27, 2019, at BOS who participated in Ms. Ortega's questioning. The identities of CBP Officers Doe #3 – #7 are currently unknown to Plaintiffs.

13. Defendant Supervisory CBP Officer Doe #1, is a Supervisory CBP Officer on shift on or about April 27, 2019 at BOS when a body search of Ms. Ortega and separation and questioning of N.Z occurred. The identity of Supervisory CBP Officer Doe #1 is currently unknown to Plaintiffs.

14. Defendant Supervisory CBP Officer Doe #2, is a Supervisory CBP Officer on shift on or about September 8, 2019, at BOS and who approved two pat downs of Ms. Ortega. The identity of Supervisory CBP Officer Doe #2 is currently unknown to Plaintiffs.

15. Defendant CBP Officer Doe #8 is a CBP officer on shift on or about August 20, 2020, at BOS who participated in Ms. Ortega's and N.Z.'s detention and questioning, and helped facilitate search of her body for the first time that day. The identity of CBP Officer Doe #8 is currently unknown to Plaintiffs.

16. Defendants CBP Officers Doe #9 and #10, are female CBP officers on shift on or about August 20, 2020, at BOS who conducted Ms. Ortega's body cavity and strip search and

participated in her detention and questioning. The identities of CBP Officers Doe #9 and #10 are currently unknown to Plaintiffs.

17.   Defendant CBP Officer Doe #11 is a CBP officer on shift on or about August 20, 2020, at BOS who participated in Ms. Ortega's detention and helped facilitate a search of her body for the second time that day. The identity of CBP Officer Doe #11 is currently unknown to Plaintiffs.

18.   Defendant Supervisory CBP Officer Doe #3, is a Supervisory Officer on shift on or about August 20, 2020 at BOS who approved a body search of Ms. Ortega and the separation and questioning of N.Z. Supervisory CBP Officer Doe #3 is currently unknown to Plaintiffs.

19.   Defendant CBP Officer Doe #12 is a CBP officer on shift on or about April 27, 2019, at BOS who participated in the separation, detention and questioning of N.Z. The identity of CBP Officer Doe #12 is currently unknown to Plaintiffs.

20.   Defendant CBP Officer Doe #13, is a CBP officer on shift on or about August 20, 2020, at BOS who participated in the separation of N.Z. from her mother. The identity of CBP Officer Doe #13 is currently unknown to Plaintiffs.

21.   Defendant Troy A. Miller is Commissioner of Customs and Border Protection, which controls U.S. ports of entry. He has authority over all agency guidance, policies, practices, and personnel. Plaintiffs sue him in his official capacity.

22.   Defendant agency United States Department of Homeland Security ("DHS") manages Customs and Border Protection.

23.   Defendant Alejandro Mayorkas is Secretary of the United States Department of Homeland Security. He has authority over all DHS policies and practices, including those challenged here. Plaintiffs sue him in his official capacity.

24.     Defendant United States of America manages the United States Department of Homeland
        Security, which includes Customs and Border Protection.

## FACTUAL ALLEGATIONS

25.     Each year, millions of travelers enter the United States through ports of entries in airports
        like BOS.

26.     CBP, among other tasks, monitors ports of entry to enforce applicable U.S. laws, including
        those regarding smuggling or importation of weapons and narcotics.

### CBP National Standards on Transport, Escort, Detention, and Search ("TEDS")

27.     In order to ensure the safety of travelers and agents, as well as to ensure that constitutional
        rights and legal requirements are upheld, on or around October 2015, CBP promulgated
        policies and procedures called the CBP National Standards on Transport, Escort, Detention
        and Search ("TEDS") that govern and instruct the behavior of CBP officers including
        Defendants.

28.     TEDS also includes requirements related to: sexual abuse and assault prevention and
        response; care of at-risk individuals in custody; and personal property.

29.     Under TEDS Rule 1.2, CBP officers must speak and act with the utmost integrity and
        professionalism.

30.     Under TEDS Rule 1.3, CBP expresses a "Zero Tolerance" policy for sexual abuse. CBP
        prohibits all forms of sexual abuse of individuals in CBP custody, including in detention
        facilities, during transport, and during processing.

31.     Under TEDS Rule 1.4, CBP officers must treat all individuals with dignity and respect and
        must perform their duties in a non-discriminatory manner, with respect to all forms of
        protected status under federal law, regulation, Executive Order, or policy, and with full

respect for individual rights including equal protection under the law, due process, freedom of speech and religion, freedom from excessive force, and freedom from unreasonable searches and seizures.

32.     Under TEDS Rule 1.7, CBP officers must communicate all instructions and relevant information to detainees in a language or manner the detainees can comprehend.

33.     Under TEDS Rule 1.9, CBP officers must make every effort to maintain family unity to the greatest extent operationally feasible, absent a legal requirement or an articulable safety or security concern that requires separation.

34.     Under TEDS Rule 3.1, recognizing the potential intrusiveness of searches on an individual's sense of privacy, CBP officers must conduct searches only with the proper legal authority and justification, with due recognition and deference for the human dignity of those being searched, and in accordance with the operational office's policies and procedures.

35.     Under TEDS Rule 3.3, CBP officers must communicate all search instructions to the detainee in a language or manner the detainee can comprehend. CBP officers must explain the search process, in general terms, as the search progresses.

36.     Under TEDS Rule 3.7, a strip search requires a person to remove or arrange some or all clothing to permit a visual inspection of the person's breasts, buttocks, or genitalia related to searches for contraband. CBP officers/agents should not touch the detainee during a strip search unless the detainee refuses to remove any article of clothing or otherwise impedes the officer/agent in the performance of their duties.

37.     Under TEDS Rule 3.8, a body cavity search is any internal search consisting of the visual or physical intrusion into the rectal or vaginal cavity. CBP officers/agents are prohibited from conducting physically intrusive body cavity searches. This type of body cavity search should

be conducted only under the most exceptional circumstances, and only by medical

practitioners at a medical facility. Body cavity searches shall be conducted only after being

approved by a supervisor authorized by the operational office's policies and procedures and

after obtaining consent or a search warrant.

38.     Under TEDS Rule 3.8, only medical practitioners may observe a physically intrusive body

cavity search. CBP officers/agents may be in the room only for the purposes of

corroborating any evidence found and to provide safety and security. CBP officers/agents

are prohibited from serving as a medical witness (standby).

39.     Under TEDS Rule 5.1, juveniles, persons known or reasonably believed to be less than 18

years of age, are members of an at-risk population.

40.     Under TEDS Rule 5.6, family units with juveniles should not be separated. When it is

necessary to separate juveniles from the parent(s) and/or legal guardian(s), officers/agents

must follow legal requirements and their operational office's policies and procedures.

41.     Under TEDS Rule 8.0, a detainee is any person, regardless of citizenship or nationality,

under arrest, restrained, or confined by CBP; and a juvenile is a person known or reasonably

believed to be less than 18 years of age.

42.     Under TEDS Rule 8.0, sexual abuse committed by a CBP employee includes penetration,

however slight, of the anal or genital opening of another person by a hand or finger or by

any object, that is unrelated to official duties or where the staff member, contractor, or

volunteer has the intent to abuse, arouse, or gratify sexual desire whether with or without the

consent of the detainee.

**Neisa Ortega – Incident One: April 27, 2019**
***Ms. Ortega was unlawfully searched, seized, and assaulted by CBP Officers at Boston Logan Airport.***

43.   On or about April 27, 2019, Neisa Ortega and her minor daughter, N.Z., flew into BOS from the Dominican Republic, where they had been visiting family while N.Z. was on spring break from middle school.

44.   Ms. Ortega and N.Z. were not carrying illegal drugs or engaged in criminal activity of any kind.

45.   Almost immediately after their arrival that morning, CBP officers approached Ms. Ortega and N.Z.

46.   CBP Officers Doe #1 and #2 escorted Ms. Ortega and N.Z. downstairs to baggage claim, where Ms. Ortega and N.Z. picked up their checked baggage.

47.   After Ms. Ortega and N.Z. retrieved their checked baggage, at approximately 9 A.M., CBP officers led Ms. Ortega and N.Z. into a separate room for secondary inspection ("secondary room").[2]

48.   Neither Ms. Ortega nor N.Z. was told why they were selected for additional screening.

49.   While in the secondary room, the CBP officers opened and inspected the contents of Ms. Ortega's and N.Z.'s suitcases.

50.   In her baggage, CBP officers found private love letters and souvenirs Ms. Ortega's husband had given her.

51.   These CBP officers, including CBP Officers Doe #1 and #2, laughed and made fun of these items. Ms. Ortega and N.Z. remained seated, silent, scared, and embarrassed.

---

[2] Throughout this complaint, the various rooms in which the events occurred are labeled for clarity and ease of reading. The official designations of these rooms are unknown to Plaintiffs.

52.     The search of Ms. Ortega and N.Z.'s baggage revealed no evidence of any illegal activity or substances.

53.     CBP officers seized Ms. Ortega and N.Z.'s cell phones and passports.

54.     CBP officers demanded Ms. Ortega and N.Z.'s cell phone passwords, and searched through the contents of their cell phones, including private text messages.

55.     Ms. Ortega and N.Z. felt humiliated and violated as multiple CBP officers searched through intimate messages and other private content on the cell phones.

56.     According to CBP documents received on February 10, 2021 in response to Ms. Ortega's Freedom of Information Act request, "a search of both phones was conducted with nothing derogatory discovered."

57.     After Ms. Ortega and N.Z.'s baggage and cell phone search ended, a CBP officer asked Ms. Ortega to stay seated.

58.     After approximately one hour in the secondary room, CBP Officers Doe #1 and #2 asked Ms. Ortega to follow them into a smaller, adjoining room ("inspection room"), without N.Z., who remained in the secondary room.

59.     Ms. Ortega did not want to leave N.Z. alone, and N.Z. did not want to be separated from her mother.

60.     Ms. Ortega and N.Z. were not told the reason for their separation or how long they would be separated. Fearful of the consequences if she resisted, Ms. Ortega followed CBP Officers Doe #1 and #2 into the inspection room, without her daughter.

61.     Ms. Ortega speaks Spanish and has limited English proficiency, but CBP Officers Doe #1 and #2 did not provide her with an interpreter, nor did they seek affirmation that she understood what they were saying to her in English or what was happening.

62. At some point while Ms. Ortega was in the inspection room, CBP Officers Doe #1, #2 and #3 explained that they planned to take Ms. Ortega to the hospital for x-rays of her stomach and had her sign a consent form to be x-rayed.

63. However, CBP officers never took Ms. Ortega to the hospital for an x-ray of her stomach.

64. Instead, Ms. Ortega was taken into a smaller room ("search room") connected to the inspection room.

65. CBP Officers Doe #1 and #2 only communicated commands in English to Ms. Ortega, ordering her to "cooperate."

66. CBP Officer Doe #1 put her hands on Ms. Ortega's stomach and pressed down.

67. CBP Officers Doe #1 and #2 demanded Ms. Ortega to strip below the waist. When Ms. Ortega asked them why, she received no response, except for a stern command to "cooperate."

68. CBP documents, received on February 10, 2021, from Ms. Ortega's Freedom of Information Act request indicate that a "partial body search was requested to search her groin area."

69. CBP Officers Doe #1 and #2 performed a strip search of Ms. Ortega, asking her to remove her pants and underwear, and then examined her, without leaving the room to talk to any other officers or supervisors.

70. Upon information and belief, a Supervisory CBP Officer Doe #1 was on duty supervising Officers Doe #1 and #2.

71. On or around April 27, 2019, Ms. Ortega was about to start her menstrual period, so she was wearing a make-shift pad made from toilet paper inside her underwear to capture the spotting, while at the airport.

72. When Ms. Ortega removed her underwear during the strip search, CBP Officers Doe #1 and #2 found the toilet paper and asked why it was in her underwear. Ms. Ortega explained that she was wearing the toilet paper as a pad to catch her bleeding from her period.

73. CBP Officers Doe #1 and #2 became excited after seeing the toilet paper in Ms. Ortega's underwear. CBP Officers Doe #1 and #2 demanded Ms. Ortega spread her legs, and continued with more forcible touching of Ms. Ortega's body.

74. For a prolonged period of time, Ms. Ortega stood naked from the waist down, alone in a small search room surrounded by CBP officers. She felt vulnerable and was visibly distressed, evidenced by her uncontrollable tears and physical demeanor.

75. CBP Officers Doe #1 and #2 asked Ms. Ortega to face the wall, and put her hands above her head against the wall.

76. Despite having nothing inside or visibly protruding from her vaginal cavity, CBP Officers performed a visual cavity search of Ms. Ortega's vaginal and anal cavities.

77. Without leaving the room to speak with any other officers, CBP Officer Doe #1 put on gloves and pulled Ms. Ortega's legs apart. CBP Officer Doe #1 used her two gloved fingers to widen Ms. Ortega's vaginal cavity.

78. CBP Officer Doe #1 conducted a vaginal cavity search of Ms. Ortega, and digitally penetrated Ms. Ortega's vagina with her fingers despite observing Ms. Ortega's obvious apprehension and distress.

79. CBP Officer Doe #1 conducted the search in a very rough manner, continually penetrating Ms. Ortega, and using her fingers to forcibly spread Ms. Ortega's vaginal cavity wider and wider.

80. CBP Officer Doe #2 was present for the search and witnessed the penetration.

81.  Ms. Ortega was crying throughout the search, and felt violated by CBP Officer Doe #1.

82.  CBP Officers Doe #1 and #2 did not find illegal drugs or any evidence of any illegal activity in their search.

83.  Confused and distressed, Ms. Ortega kept turning her head from the wall and looking back at CBP Officer Doe #1 as that officer was penetrating her.

84.  CBP Officer Doe #1 stopped the penetration, and CBP Officers Doe #1 and #2 told Ms. Ortega that because she kept looking back, she interrupted the search, and they would need to begin the entire search again.

85.  Neither CBP Officers Doe #1 nor #2 spoke with anyone before proceeding with the second vaginal cavity search.

86.  CBP Officer Doe #1 did not observe any contraband protruding from Ms. Ortega's anal or vaginal cavities.

87.  CBP Officer Doe #1 spread open Ms. Ortega's vagina and then visually inspected Ms. Ortega's vaginal and anal cavities.

88.  CBP Officer Doe #2 was present for the search and witnessed the spreading apart of Ms. Ortega's vagina.

89.  CBP Officer Doe #1 did not observe any indication of illegal substances in Ms. Ortega's anal or vaginal cavities.

90.  Throughout the detention and searches, Ms. Ortega felt anxious and sexually violated, and she was experiencing physical pain and emotional distress.

91.  Upon observing Ms. Ortega's distress and continued tears, CBP Officers Doe #1 and #2 told Ms. Ortega they were sorry for "doing what [they] had to do."

92.  CBP Officers Doe #1 and #2 did not allow Ms. Ortega to leave or reunite her with her daughter after the vaginal searches resulted in negative findings for illegal drugs or activity.

93.  CBP Officers Doe #1 and #2, took turns staying in the room with Ms. Ortega, while the other exited the room.

94.  During this time, Ms. Ortega repeatedly expressed concern and asked questions about the location of N.Z. CBP Officers Doe #1 and #2 did not tell Ms. Ortega where N.Z. was, but just told her not to worry about the location of her daughter.

95.  Eventually, CBP Officers Doe #1 and #2, returned to the search room with CBP Officers Doe #3-7.

96.  While confined in the inspection and search rooms, Ms. Ortega was interrogated by approximately seven CBP officers, including CBP Officers Doe #1-7.

97.  CBP officers interrogated Ms. Ortega about her marriage, her job history, her travel history to the Dominican Republic and whether she "brought something from someone," and her immigration status. Multiple officers asked her why she did not eat on the plane, and why she purchased two one-way tickets.

98.  After approximately three to four hours of confinement in the secondary, inspection, and search rooms, CBP officers released Ms. Ortega.

99.  Ms. Ortega was finally able to reunite with her daughter in the secondary room and was distressed to see her daughter clearly fearful and visibly upset.

100.  Ms. Ortega was physically and mentally traumatized by the CBP officers' actions; this was something she had never experienced before in her many years of travelling.

**Neisa Ortega – Incident Two: September 8, 2019**
*CBP Officers at Boston Logan Airport continued to unlawfully target Ms. Ortega, subject her to prolonged periods of confinement, intense interrogations, and fear of imminent assault.*

101.    On or about September 8, 2019, Ms. Ortega and a friend flew into BOS from the Dominican Republic, where they had been visiting Ms. Ortega's family on a routine visit that lasted one week.

102.    Ms. Ortega was not carrying illegal drugs or engaged in criminal activity of any kind.

103.    Once again, despite finding no evidence of illegal substances or wrongdoing at the last incident, Ms. Ortega and her companion were almost immediately approached by multiple CBP officers after getting off the plane.

104.    Ms. Ortega and her companion were taken to the secondary room.

105.    Multiple CBP officers separated Ms. Ortega from her companion, and escorted Ms. Ortega into the inspection room.

106.    Just like in the prior incident, Ms. Ortega was confined alone in the inspection room by multiple CBP officers and given no explanation or justification for her confinement.

107.    In the inspection room, multiple CBP officers questioned Ms. Ortega about her job history and the nature of her trip. She explained she had been visiting family in the Dominican Republic for one week.

108.    In the secondary and inspection rooms, multiple CBP officers and their dogs searched Ms. Ortega and her belongings.

109.    While the CBP search dogs sniffed Ms. Ortega and her luggage, CBP officers led the dogs to sniff up her skirt multiple times, which felt further humiliating and dehumanizing, especially given the history of invasive searches performed on Ms. Ortega.

110.   The search dogs and multiple CBP officers found no indication of illegal substances on Ms. Ortega or her companion.

111.   CBP documents, received on February 10, 2021, from Ms. Ortega's Freedom of Information Act request, also indicate that Supervisory CBP Officer Doe #2 approved two "pat down" searches of Ms. Ortega and that CBP officers performed two "pat downs" of her.

112.   The aforementioned CBP documents indicate that no evidence of illegal substances was found on Ms. Ortega.

113.   CBP officers confined, observed, searched and questioned Ms. Ortega for several hours in the inspection room before releasing her.

114.   Ms. Ortega suffered physical and emotional distress from this incident.

**Neisa Ortega – Incident Three: March 16, 2020**
***CBP Officers at Boston Logan airport repeatedly targeted Ms. Ortega for additional searches compounding her physical and emotional trauma from CBP's prior conduct with her.***

115.   On or about March 16, 2020, Ms. Ortega flew into BOS from the Dominican Republic, where she had been visiting family on a routine visit.

116.   Ms. Ortega was not carrying illegal drugs or engaged in criminal activity of any kind.

117.   Once again, almost immediately, Ms. Ortega was approached by multiple CBP officers who said they would have to search her luggage, despite the continued negative findings in previous incidents.

118.   Once again, Ms. Ortega was escorted to the secondary room, where CBP officers searched her luggage.

119.   Once again, Ms. Ortega's luggage revealed no evidence of illegal substances. She was subsequently released.

120.    Ms. Ortega experienced severe anxiety throughout the search of her luggage, given CBP's

prior conduct in detaining and searching her.

**Neisa Ortega – Incident Four: August 20, 2020**
*CBP officers at Boston Logan Airport yet again unlawfully searched, seized, and assaulted*
*Ms. Ortega without reasonable suspicion.*

121.    On or about August 20, 2020, Ms. Ortega and her minor daughter, N.Z., flew into BOS from

the Dominican Republic, where they had been visiting family.

122.    Ms. Ortega and N.Z. were not carrying illegal drugs or engaged in criminal activity of any

kind.

123.    Once again, almost immediately after getting off the plane, Ms. Ortega and N.Z. were

approached by multiple CBP officers, who said they would need to search their luggage,

despite continued negative findings of any illegal substances in previous incidents.

124.    Multiple CBP officers collected Ms. Ortega and N.Z.'s bags and, once again, escorted them

into the secondary room.

125.    As in the previous incident, multiple CBP officers separated Ms. Ortega from N.Z., without

explanation and without giving any indication of when they would be reunited.

126.    Multiple CBP officers escorted Ms. Ortega into a nearby inspection room—this time, one

adjacent to the baggage claim area—separating her from N.Z., who was left sitting alone

near baggage claim.

127.    Multiple CBP officers told Ms. Ortega to wait in the inspection room. She was very anxious

and physically and emotionally distressed.

128.    After approximately twenty minutes, CBP Officer Doe #8 called Ms. Ortega into the smaller

adjoining search room.

129.    Throughout Ms. Ortega's detention, CBP Officer Doe #8 interrogated Ms. Ortega in
        Spanish.

130.    CBP Officer Doe #8 interrogated Ms. Ortega about her current job, her previous job, why
        she left that job, and about her employer.

131.    During the interrogation, CBP officers escorted Ms. Ortega to a small room with a table in it
        adjoining both the inspection and search rooms ("table room") and proceeded to search Ms.
        Ortega and N.Z.'s luggage. The search revealed no evidence of illegal activity.

132.    While in this room, CBP officers continued to interrogate Ms. Ortega. Ms. Ortega was then
        returned to the adjoining inspection room.

133.    CBP Officer Doe #8 called female CBP Officers Doe #9 and #10 into the inspection room,
        and escorted Ms. Ortega into the smaller adjoining search room.

134.    CBP documents, received on February 10, 2021, from Ms. Ortega's Freedom of Information
        Act request indicate that Supervisory CBP Officer Doe #3 approved a pat down of Ms.
        Ortega.

135.    When the Officers Doe #9 and #10 walked in, Ms. Ortega was reminded of her previous
        assault by CBP into her vaginal cavity, and instantly began to cry.

136.    Through tears, Ms. Ortega asked the multiple CBP Officers to explain what was happening
        and why this kept happening to her.

137.    Officer Doe #8 declined to answer and instead left the room, leaving Ms. Ortega with
        Officers Doe #9 and #10.

138.    Ms. Ortega informed the CBP officers that CBP had previously searched her on prior
        occasions and found no evidence of illegal activity.

139.    CBP Officers Doe #9 and #10 ordered Ms. Ortega to strip off all her clothes below the waist.

140.   CBP Officers Doe #9 and #10 conducted a strip search of Ms. Ortega by ordering her to undress and thereby reveal her naked body for their inspection.

141.   The search room adjoins both the inspection room and the table room. The doors were left open and Ms. Ortega could see male CBP officers watching her, including CBP Officers Doe #8 and #11.

142.   Ms. Ortega pleaded to CBP Officers Doe #9 and #10 in distress, explaining that she had done nothing wrong and had no illegal substances.

143.   CBP Officers Doe #9 and #10 responded they were merely doing their jobs and it was not their fault that this was happening.

144.   Despite observing Ms. Ortega's physical and emotional distress, CBP Officers Doe #9 and #10 commanded Ms. Ortega to cooperate.

145.   CBP Officers Doe #9 and #10 told Ms. Ortega to turn around, put her hands up, and against the wall.

146.   Anxious, distressed, and crying, Ms. Ortega undressed and put her hands up against the wall.

147.   Ms. Ortega did not have anything inside her vaginal cavity or anything protruding from her vaginal cavity.

148.   Nevertheless, CBP Officer Doe #9 put on gloves and pulled Ms. Ortega's legs apart.

149.   CBP Officer Doe #9 penetrated Ms. Ortega's vaginal cavity with her fingers, then painfully and continually tried to spread Ms. Ortega's vaginal cavity wider.

150.   CBP Officer Doe #9 did not find any illegal substances or indication of illegal substances from the vaginal search she performed on Ms. Ortega.

151.   Throughout the vaginal cavity search, Ms. Ortega was anxious and experiencing physical and emotional pain.

152. At no point during the vaginal cavity search did CBP Officers close the doors to the search room, leaving Ms. Ortega exposed throughout the search to male officers watching her from the adjoining rooms. Ms. Ortega saw CBP Officers Doe #8 and #11 watching her from the table room.

153. CBP Officers Doe #9 and #10 did not allow Ms. Ortega to leave or reunite her with her daughter after the negative findings in the vaginal cavity search. Instead, CBP Officers Doe #9 and #10 told Ms. Ortega to put her clothes back on, and wait outside in the inspection room while they searched other individuals.

154. Ms. Ortega waited for approximately thirty minutes before CBP Officer Doe #11 called her back inside.

155. During this time, Ms. Ortega remained separated from N.Z., and did not know where her daughter was or what was happening to her daughter.

156. CBP Officer Doe #11 told Ms. Ortega that she would not be allowed to leave the airport until she was searched again.

157. CBP Officer Doe #9 escorted Ms. Ortega, once again, into the small, adjoining search room and ordered Ms. Ortega to strip completely below the waist.

158. Ms. Ortega was scared and confused, and asked CBP Officer Doe #9 why she was being searched again.

159. CBP Officer Doe #9 did not answer Ms. Ortega's question and instead commanded her again to strip.

160. Standing completely undressed below the waist, in front of CBP Officer Doe #9, Ms. Ortega had nothing inside her vaginal cavity or anything protruding from her vaginal cavity.

161. Ms. Ortega could once again see male CBP Officers, including CBP Officers Doe #8 and #11, watching her from the table room.

162. Despite having no visual evidence of illegal substances, and a negative finding from a previous penetrative vaginal search less than an hour earlier, CBP Officer Doe #9 pulled Ms. Ortega's legs apart and used her fingers to penetrate Ms. Ortega's vaginal cavity.

163. CBP Officer Doe #9 also visually inspected Ms. Ortega's vaginal and anal cavities.

164. Ms. Ortega was crying throughout the search, and was exposed and sexually violated by CBP Officer Doe #9.

165. CBP Officer Doe #9 did not find any illegal substances or indication of illegal substances from the vaginal searches she performed on Ms. Ortega.

166. CBP Officers Doe #9 and #10 interrogated Ms. Ortega, and asked if she ever used illegal drugs. Ms. Ortega repeated again that she never used drugs and had no criminal history at all.

167. CBP finally released Ms. Ortega a few hours after her initial confinement.

168. Upon release to the baggage claim area, Ms. Ortega broke down physically and emotionally. She was distressed that once again she was separated from her daughter, subjected to invasive searches, and sexually violated repeatedly.

169. Ms. Ortega was further distressed by witnessing her daughter visibly upset upon being reunited and worried as to what trauma her child endured.

170. Observing her distress, CBP Officers Doe #9 and #10 sat with Ms. Ortega, rubbed her shoulders, and apologized for their behavior.

171. CBP Officers Doe #9 and #10 said they would personally walk her out towards baggage claim so "no one would touch her."

**Neisa Ortega – Life After the Incidents**
*As a result of CBP officers' unlawful behavior, Ms. Ortega lives with severe physical and emotional trauma and the fear she will continue to be unlawfully searched, seized, and assaulted.*

172.   Ever since the incident on April 27, 2019, Ms. Ortega has experienced lasting trauma and physical and emotional distress. She is nervous around all law enforcement officers, and continues to be anxious that they will confine her for any reason and without justification.

173.   Ms. Ortega now spends many nights crying, feeling "desperate," and wrestling with the traumas she has experienced at the hands of CBP officers.

174.   As a result of these experiences, Ms. Ortega has difficulty sleeping at night and waking up in the morning.

175.   As a result of CBP's treatment of Ms. Ortega, she suffered panic attacks at work, which forced her to leave her job and find new employment.

176.   As a result of CBP's actions, Ms. Ortega struggles when in public and is always on high alert. She suffers from panic attacks when she is around many people.

177.   Ms. Ortega still feels humiliation over people seeing her public panic attacks.

178.   Ms. Ortega has lost much of her hair since the first incident due to the resulting stress and depression.

179.   Due to CBP's treatment of Ms. Ortega, she has changed the way she dresses, wearing baggy clothing and wearing pants more frequently.

180.   Each time Ms. Ortega travels, as is routine and necessary in her life, she fears that CBP officers will take her into the "small room," where they will interrogate and abuse her.

181.   When in the Dominican Republic, Ms. Ortega barely sleeps because of her fear of having to come back under CBP scrutiny upon her return.

182. As a result of these incidents, Ms. Ortega does not check luggage and only brings a carry-on when she has to fly into BOS.

183. As a result of CBP's actions, Ms. Ortega only wears pants when she has to fly.

184. Ms. Ortega regularly reflects on her humiliation and the feeling that CBP treated her body like an object.

185. Ms. Ortega has suffered isolation due to these events. Her regular travel companions no longer want to fly with her. People have refused to pick her up from the airport. Friends have told her they fear CBP associating their names with her and subjecting them to the same abuse.

**N.Z. – Incident One: April 27, 2019**
***N.Z., Ms. Ortega's fourteen-year-old daughter, was unlawfully searched, seized, and
interrogated by CBP Officers at Boston Logan airport.***

186. As described in paragraphs 43 *et seq.* above, Plaintiff N.Z. arrived with her mother, Ms. Ortega, into BOS from the Dominican Republic on April 27, 2019. CBP officers brought N.Z. and Ms. Ortega to the secondary room and searched their luggage.

187. CBP Officer Doe #12 demanded N.Z. provide her cell phone passcode. Fearful of the consequences if she refused, N.Z. gave CBP Officer Doe #12 the password to her cell phone.

188. CBP Officer Doe #12 searched the contents of N.Z.'s cell phone including private text messages, audio files, photographs and other personal content.

189. CBP Officer Doe #12 interrogated N.Z., including asking her questions about the people she had pictures with in her phone.

190. N.Z. was fearful of what would happen if she refused to answer, so she answered CBP officers' questions despite feeling upset that her privacy was being invaded.

191.   CBP Officer Doe #12 then separated N.Z. from her mother. N.Z. was directed to sit inside
       the secondary room while her mother was taken to the adjoining inspection room.

192.   CBP Officer Doe #12 did not tell N.Z. where her mother was or why she and her mother
       were being detained.

193.   CBP Officer Doe #12 asked N.Z. if she had "something in her belly" that someone gave her.

194.   N.Z. denied carrying anything in her belly. She felt uncomfortable by this unusual line of
       questioning.

195.   CBP Officer Doe #12 gave her crackers and juice and watched her eat. N.Z. was then left
       alone in the secondary room for the remaining hours before she and Ms. Ortega were
       released.

196.   Despite being only 14, N.Z. was not allowed to have a trusted adult or guardian with her
       while CBP Officer Doe #12 interrogated her. No trusted adult gave consent to the
       interrogation.

197.   During this time, N.Z. attempted to enter the inspection room to find her mother, but the
       door was locked. No one came to check on N.Z.

198.   N.Z. was anxious and afraid of what CBP Officer Doe #12 might do to her and was upset
       that she was separated from her mother and interrogated.

199.   N.Z. felt worried about what was happening to her mother. She wanted to go home.

200.   After approximately three to four hours, N.Z. was reunited with her mother. CBP officers
       found no evidence of illegal drugs or any kind of wrongdoing connected with N.Z.

201.   When they reunited, N.Z. was sad, scared, and angry due to seeing her mother crying. N.Z.
       had never seen her mother "cry like that" before and therefore believed CBP officers must
       have done something very bad to her mother.

202.    N.Z. felt scared that CBP would do something just as bad to her in the future.

203.    CBP Officer Doe #12's confinement, separation, and interrogation of N.Z., as well as N.Z.'s

        witnessing of her mother's distress over CBP officers' actions, were highly traumatic for

        N.Z. These incidents caused her emotional distress at the time and thereafter.

### N.Z. – Incident Two: August 20, 2020
*Without reasonable suspicion or any explanation, N.Z., was separated from her mother and unlawfully seized by CBP Officers at Boston Logan Airport.*

204.    As described above in paragraph 121 *et seq.* above, on or about August 20, 2020, Ms.

        Ortega and N.Z. flew into BOS from the Dominican Republic, where they had been visiting

        family.

205.    Ms. Ortega and N.Z. were not carrying illegal drugs or engaged in criminal activity of any

        kind.

206.    N.Z. felt anxious about returning through BOS because she feared being separated from her

        mother and interrogated, and she was worried that CBP officers would put their hands on

        her or her mother.

207.    Almost immediately after deplaning, Ms. Ortega and N.Z. were approached by multiple

        CBP officers, who said they would need to have their luggage searched, despite continued

        negative findings in previous incidents.

208.    Multiple CBP officers collected Ms. Ortega and N.Z.'s bags and escorted them into the

        secondary room.

209.    Once again, CBP officers separated N.Z. from her mother. CBP officers led Ms. Ortega and

        N.Z. out of the secondary room. Then, CBP Officer Doe #13 led N.Z. to a seating area in the

        public baggage claim area, while another officer led Ms. Ortega to an inspection room

        adjoining the public baggage claim area.

210.   CBP Officer Doe #13 did not provide any explanation to N.Z. of when her mother would be released from the inspection room, and the officer did not make any effort to ensure that N.Z., a minor, felt safe sitting in a public area alone in an airport.

211.   Many people walked by N.Z. while she was forced to wait alone for her mother.

212.   During this time, N.Z. was afraid that CBP officers would do to her what they did to her mother during the last separation. N.Z. was anxious and worried about what CBP officers were doing to her mother, especially since she knew details of the trauma her mother had suffered on prior occasions.

213.   After a few hours of separation, N.Z. witnessed her mother come out of the inspection room into baggage claim, where her mother broke down physically and emotionally about what CBP had done to her.

214.   N.Z. still feels angry about CBPs' actions, and is nervous when flying with her mother to BOS.

215.   N.Z. continues to experience emotional harm from CBP's detention and interrogations of her, from being separated from her mother, and from her mother's assault and repeated trauma at the hands of CBP.

216.   N.Z. often thinks of the CBP officers' actions against her and her mother. N.Z. has had difficulty sleeping, she struggles with angry outbursts, and experiences her heart pounding, hands shaking, and a feeling of butterflies in her stomach when she thinks about CBP's actions.

217.   Due to CBP's actions, N.Z. passes up opportunities to socialize so that she can stay close to her mother.

218.   As a result of CBP's treatment of N.Z. and her mother, N.Z. often cries when she is alone, and in the weeks following the incident, N.Z. constantly questioned her mother about why CBP did this to them.

**Plaintiffs Neisa Ortega and N.Z.**
***Exhaustion of Administrative Remedies***

219.   Pursuant to 28 U.S.C. § 2675(a), Ms. Ortega submitted an administrative claim on behalf of herself and N.Z., to the Department of Homeland Security and U.S. Customs and Border Protection on January 19, 2021.

220.   The Federal Tort Claims Act states that the United States is liable for tortious acts of its employees in "circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b).

221.   On June 17, 2021, CBP denied the claim in full.

222.   Ms. Ortega and N.Z. have administratively exhausted their remedies under the FTCA.

223.   Although not required for exhaustion of remedies, Ms. Ortega additionally filed a complaint with the DHS Office for Civil Rights and Civil Liberties (CRCL) under 6 U.S.C. § 345 and 42 U.S.C. § 2000ee-1 on November 5, 2020.

224.   On March 30, 2021, DHS CRCL closed the complaint.

## CAUSES OF ACTION

### Constitutional Violations

**COUNT 1**
**Fourth Amendment Claim for Prolonged Detention, Strip Searches, and Body and Vaginal Cavity Searches of Ms. Ortega Without Reasonable Suspicion**
**(by Plaintiff Neisa Ortega against CBP, DHS, and All Individual Defendants, in their official capacities)**

225.    The foregoing allegations are re-alleged and incorporated herein by reference.

226.    The Fourth Amendment of the United States Constitution protects against unreasonable

searches and seizures.

227.    Defendants violated the Fourth Amendment by detaining Ms. Ortega, by searching her

baggage, personal letters, and electronic devices, and by conducting strip searches, body

searches, and vaginal cavity searches of Ms. Ortega, absent a warrant supported by probable

cause and without reasonable suspicion that contraband was being concealed on her body.

**COUNT 2**
**Fifth Amendment Claim for Body and Vaginal Cavity Searches of Ms. Ortega**
**(by Plaintiff Neisa Ortega against Defendants CBP, DHS, and All Individual Defendants in**
**their official capacities)**

228.    The foregoing allegations are re-alleged and incorporated herein by reference.

229.    The Fifth Amendment of the United States Constitution requires that the right to life, liberty,

and property not be denied without due process of law.

230.    Defendants violated the Fifth Amendment by violating Ms. Ortega's bodily integrity when

they conducted strip searches, body searches, and vaginal cavity searches of Ms. Ortega in a

manner that shocks the conscience.

**COUNT 3**
**Unreasonable *Search* of Ms. Ortega in Violation of the Fourth Amendment - *Bivens***
**(by Plaintiff Neisa Ortega against Defendants CBP Officers Doe #1-2, 8-11, in their**
**individual capacities and Supervisory CBP Officers Doe #1-3, in their individual capacities)**

231.    The foregoing allegations are re-alleged and incorporated herein by reference.

232.    As a direct result of their actions set forth in this Complaint, Defendants CBP Officers Doe

#1-2, 8-11 and Supervisory CBP Officers Doe #1-3 acted under the color of federal law to

deprive Ms. Ortega of her right to be free from unreasonable governmental intrusion by

searching her belongings as well as her person and/or by performing or aiding in strip

searches and body cavity searches all without reasonable suspicion, in violation of the Fourth Amendment of the United States Constitution.

233. This cause of action for the violation of Plaintiff's Fourth Amendment right is brought pursuant to Bivens v. Six Unknown Agents, 403 U.S. 388 (1971).

## COUNT 4
### Unreasonable *Seizure* of Ms. Ortega in Violation of the Fourth Amendment - *Bivens*
### (by Plaintiff Neisa Ortega against Defendants CBP Officers Doe #1-11 in their individual capacities and Supervisory CBP Officers Doe #1-3 in their individual capacities)

234. The foregoing allegations are re-alleged and incorporated herein by reference.

235. As a direct result of their actions set forth in this Complaint, Defendants CBP Officers Doe #1-11 and Supervisory CBP Officers Doe #1-3, acted under the color of federal law to deprive Ms. Ortega of her right to be free from unreasonable governmental intrusion by seizing her for a prolonged period of time and subjecting her to interrogation without reasonable suspicion, in violation of the Fourth Amendment of the United States Constitution.

236. This cause of action for the violation of Plaintiff's Fourth Amendment right is brought pursuant to Bivens v. Six Unknown Agents, 403 U.S. 388 (1971).

## COUNT 5
### Deprivation of Due Process of Ms. Ortega in Violation of the Fifth Amendment - *Bivens*
### (by Plaintiff Neisa Ortega against Defendants CBP Officers Doe #1, 2, 9, and 10 in their individual capacities and Supervisory CBP Officers Doe #1 and 3 in their individual capacities)

237. The foregoing allegations are re-alleged and incorporated herein by reference.

238. As a direct result of their actions set forth in this Complaint, Defendants CBP Officers Doe #1, #2, #9 and #10, and Supervisory CBP Officers Doe #1 and #3, acted under the color of federal law to deprive Ms. Ortega of her right to due process by acting in a manner that shocks the conscience in violation of the Fifth Amendment to the U.S. Constitution.

239.     This cause of action for the violation of Plaintiff's Fifth Amendment right is brought

         pursuant to <u>Bivens v. Six Unknown Agents</u>, 403 U.S. 388 (1971).

### COUNT 6
**Fourth Amendment Claim for Prolonged Detention and Searches of N.Z.'s Belongings
Without Reasonable Suspicion
(by Plaintiff N.Z. against Defendants CBP, DHS, and All Individual Defendants, in their
official capacities)**

240.     The foregoing allegations are re-alleged and incorporated herein by reference.

241.     Defendants violated the Fourth Amendment by detaining N.Z., a minor, by separating from

         her mother, by interrogating her alone, and by searching her baggage and electronic devices,

         absent a warrant supported by probable cause and without reasonable suspicion that

         evidence of contraband would be discovered.

### COUNT 7
**Fifth Amendment Claim for Separation of Minor from Mother, Prolonged Detention and
Invasive Questioning of Minor Alone (by Plaintiff N.Z. against Defendants CBP, DHS, and
All Individual Defendants, in their official capacities)**

242.     The foregoing allegations are re-alleged and incorporated herein by reference.

243.     Defendants violated the Fifth Amendment by separating N.Z., a minor, from her mother for

         a prolonged period of time, by detaining her for a prolonged period of time, and by

         invasively questioning her alone, all conduct that shocks the conscience.

### COUNT 8
**Unreasonable Seizure of N.Z. in Violation of the Fourth Amendment - *Bivens*
(by Plaintiff N.Z. against Defendants CBP Officers Doe #12 and 13, in their individual
capacities and Supervisory CBP Officers Doe #1 and 3, in their individual capacities)**

244.     The foregoing allegations are re-alleged and incorporated herein by reference.

245.     As a direct result of their actions set forth in this Complaint, Defendants CBP Officers Doe

         #12 and #13, and Supervisory CBP Officers Doe #1 and #3, acted under the color of federal

         law to deprive N.Z. of her right to be free from unreasonable governmental intrusion by

separating her, a minor, from her mother, seizing her for a prolonged period of time and interrogating her alone without reasonable suspicion, in violation of the Fourth Amendment of the United States Constitution.

246.   This cause of action for the violation of Plaintiff's Fourth Amendment right is brought pursuant to Bivens v. Six Unknown Agents, 403 U.S. 388 (1971).

**COUNT 9**
**Deprivation of Due Process of N.Z. in Violation of the Fifth Amendment - *Bivens***
**(by Plaintiff N.Z. against Defendants CBP Officers Doe #12 and #13 in their individual capacities and Supervisory CBP Officers Doe #1 and 3 in their individual capacities)**

247.   The foregoing allegations are re-alleged and incorporated herein by reference.

248.   As a direct result of their actions set forth in this Complaint, Defendants CBP Officers Doe #12 and #13 and Supervisory CBP Officers Doe #1 and #3, acted under the color of federal law to deprive N.Z. of her right to due process by separating N.Z., a minor, from her mother for a prolonged period of time, detaining her for a prolonged period of time and invasively questioning her alone, all conduct that shocks the conscience in violation of the Fifth Amendment to the U.S. Constitution.

249.   This cause of action for the violation of Plaintiff's Fifth Amendment right is brought pursuant to Bivens v. Six Unknown Agents, 403 U.S. 388 (1971).

*Federal Tort Claims Act - 28 U.S.C. § 1346(b)*

**COUNT 10**
**Assault**
**(by Plaintiff Ms. Ortega against Defendant United States)**

250.   The foregoing allegations are re-alleged and incorporated herein by reference.

251.   Under Massachusetts law, the elements of assault are: (1) the defendant acts intending to cause a harmful or offensive contact with another, or an imminent apprehension of such a

contact; and (2) apprehension is created and experienced by the other person.

Commonwealth v. Henson, 259 N.E.2d 769, 773–74 (Mass. 1970).

252.   Ms. Ortega was subjected to multiple unjustified and unreasonable invasive body searches including vaginal cavity searches. The individual CBP officers assaulted Ms. Ortega when they intentionally acted in a way that created an apprehension of immediate harm during these searches.

253.   Multiple CBP officers created apprehension of offensive conduct, and Ms. Ortega was apprehensive of such offensive conduct, when CBP officers engaged in detaining Ms. Ortega in a small room, ordering her to strip off her clothes, and forcing her to spread her legs.

254.   As a result of the overt acts of individual CBP officers, Ms. Ortega suffered humiliation, indignity, and physical and emotional injuries.

255.   The individual CBP officers committed these acts as employees of the United States while acting in the scope of their employment: they acted within the scope of the general authority granted to them, in furtherance of their employer's business, and for the accomplishment of the objectives for which they were hired.

256.   Pursuant to the Federal Tort Claims Act, Defendant United States is liable for the individual defendant CBP officers' actions.

**COUNT 11**
**Battery**
**(by Plaintiff Neisa Ortega against Defendant United States)**

257.   The foregoing allegations are re-alleged and incorporated herein by reference.

258.   Under Massachusetts law, the elements of battery are: (1) the defendant acts intending to cause a harmful or offensive contact with another; and (2) the harmful or offensive contact

with another person directly or indirectly results. <u>Waters v. Blackshear</u>, 591 N.E.2d 184, 185 (Mass. 1992).

259.  Ms. Ortega was subjected to multiple unjustified and unreasonable invasive vaginal cavity searches and unreasonable physical searches of her body.

260.  The individual CBP officers committed battery against Ms. Ortega when they intentionally performed multiple vaginal cavity searches and unreasonable physical searches of her body.

261.  As a result of the defendants' multiple batteries, Ms. Ortega suffered humiliation, indignity, and physical injuries.

262.  The individual CBP officers committed these acts as employees of the United States while acting in the scope of their employment: they acted within the scope of the general authority granted to them, in furtherance of their employer's business, and for the accomplishment of the objectives for which they were hired.

263.  Pursuant to the Federal Tort Claims Act, Defendant United States is liable for the individual defendant CBP officers' actions.

**COUNT 12**
**False Imprisonment**
**(by Plaintiff Neisa Ortega against Defendant United States)**

264.  The foregoing allegations are re-alleged and incorporated herein by reference.

265.  Under Massachusetts law, the elements of false imprisonment are: (1) intentional and (2) unjustified (3) confinement of a person, (4) directly or indirectly (5) of which the person confined is conscious or is harmed by such confinement. <u>Ball v. Wal-Mart, Inc.</u>, 102 F. Supp. 2d 44, 55 (D. Mass. 2000).

266.  The defendants intentionally and unjustifiably confined Ms. Ortega in various small rooms during secondary inspection.

267. The CBP officers did this on multiple occasions and for prolonged periods of time.

268. Individual CBP officers prevented Ms. Ortega from leaving by, among other things, telling her she was not free to leave unless she complied, and denying her access to her daughter.

269. Ms. Ortega was harmed by this confinement not only by the physical and emotional suffering she endured by the prolonged detention and treatment during it, but also by the effect the prolonged separation had on her and her daughter.

270. The individual CBP officers committed these acts as employees of the United States while acting in the scope of their employment: they acted within the scope of the general authority granted to them, in furtherance of their employer's business, and for the accomplishment of the objectives for which they were hired.

271. Pursuant to the Federal Tort Claims Act, Defendant United States is liable for the individual defendant CBP officers' actions.

**COUNT 13**
**Intentional Infliction of Emotional Distress**
**(by Plaintiff Neisa Ortega against Defendant United States)**

272. The foregoing allegations are re-alleged and incorporated herein by reference.

273. Under Massachusetts law, the elements of intentional infliction of emotional distress are: (1) that the defendant intended to cause, or should have known that their conduct would cause, emotional distress; (2) that the defendant's conduct was extreme and outrageous; (3) that the defendant's conduct caused the plaintiff's distress; and (4) that the plaintiff suffered severe distress. See Howcroft v. City of Peabody, 747 N.E.2d 729, 747 (Mass. App. Ct. 2001).

274. In a pattern of encounters, individual CBP officers intentionally searched, assaulted, battered, interrogated, seized, and humiliated Ms. Ortega.

275. Multiple CBP officers knew or should have known that searching the most intimate body parts of a woman without proper justification and in contravention of internal policies would cause emotional distress.

276. CBP engaged in a pattern or practice of searching Ms. Ortega's most intimate body parts without proper justification and in contravention of written policies.

277. The conduct of individual CBP officers during these searches, seizures, and interrogations was extreme and outrageous.

278. As a result of the defendants' conduct, Ms. Ortega suffered severe emotional distress including feelings of humiliation, indignity, and trauma.

279. The individual CBP officers committed these acts as employees of the United States while acting in the scope of their employment: they acted within the scope of the general authority granted to them, in furtherance of their employer's business, and for the accomplishment of the objectives for which they were hired.

280. Pursuant to the Federal Tort Claims Act, Defendant United States is liable for the individual defendant CBP officers' actions.

### COUNT 14
### Negligence
### (by Plaintiff Neisa Ortega against Defendant United States)

281. The foregoing allegations are re-alleged and incorporated herein by reference.

282. Under Massachusetts law, negligence requires a showing of: (1) a duty of care to the plaintiff; (2) a breach of that duty; (3) proximate causation; and (4) damage to the plaintiff. Bennett v. Eagle Brook Country Store, 557 N.E.2d 1166, 1168 (Mass. 1990).

283. DHS, CBP, and CBP officers owed Ms. Ortega a heightened duty of care because a special relationship exists between a lawful permanent resident and a law enforcement officer at a

36

port of entry, given law enforcement officers' reasonable foreseeability that they would be

expected to take affirmative action to protect lawful permanent residents and officers'

anticipation of harm from failing to do so. See Irwin v. Town of Ware, 467 N.E.2d 1292,

1300 (Mass. 1984).

284.   Defendants United States of America, DHS, and CBP published clearly established

standards for individual CBP officers to follow when transporting, escorting, detaining, and

searching individuals. Multiple CBP officers did not follow this internal guidance with

regards to Ms. Ortega. See TEDS Rules 1.2, 1.3, 1.4, 1.7, 1.8, 1.9, 3.1, 3.3, 3.6, 3.7, 3.8, 5.6,

6.0, and 8.0.

285.   DHS, CBP, and CBP officers breached their duties by, *inter alia*,

    1.   failing to treat Ms. Ortega with dignity and respect;

    2.   detaining Ms. Ortega for a prolonged period of time;

    3.   failing to perform their duties with full respect for individual rights, including due

        process and freedom from unreasonable searches and seizures;

    4.   failing to make any efforts to ensure commands and instructions were

        communicated to Ms. Ortega in a language she could understand;

    5.   allowing multiple CBP officers to perform vaginal cavity searches on Ms. Ortega,

        without the required legal justification, under less than exceptional circumstances,

        and at a location other than a medical facility and by individuals other than

        medical practitioners; and

    6.   unreasonably separating Ms. Ortega and her daughter without explanation.

286.   The failure of DHS, CBP, and CBP officers to treat Ms. Ortega with the proper standard of

care directly and proximately caused harm, including physical injuries, and emotional stress.

287. Pursuant to the Federal Tort Claims Act, Defendant United States is liable for the individual defendant CBP officers' actions.

## COUNT 15
### Negligent Infliction of Emotional Distress
### (by Plaintiff Neisa Ortega against Defendant United States)

288. The foregoing allegations are re-alleged and incorporated herein by reference.

289. Under Massachusetts law, the elements of negligent infliction of emotional distress are: (1) the defendant was negligent; (2) the plaintiff suffered emotional distress; (3) the plaintiff's emotional distress was caused by the defendant's negligence; (4) the plaintiff's emotional distress was evidenced by objective, physical symptoms; and (5) a reasonable person would have suffered emotional distress under the circumstances of the case. Payton v. Abbott Labs, 437 N.E.2d 171, 181 (Mass. 1982).

290. Under Massachusetts law, negligence requires a showing of: (1) a duty of care to the plaintiff; (2) a breach of that duty; (3) proximate causation; and (4) damage to the plaintiff. Bennett v. Eagle Brook Country Store, 557 N.E.2d 1166, 1168 (Mass. 1990).

291. In a pattern of encounters, individual CBP officers intentionally searched, seized, assaulted, battered, interrogated, and humiliated Ms. Ortega.

292. DHS, CBP, and CBP officers were negligent in that they breached their duty of care to Ms. Ortega, which directly and proximately caused harm.

293. Ms. Ortega suffered emotional distress in the form of humiliation, indignity, and desperation as she was separated from her daughter.

294. Ms. Ortega's emotional distress was caused by DHS's, CBP's, and CBP officers' negligence.

295. Ms. Ortega demonstrated objectively observable physical manifestations of her physical pain and emotional distress.

296. A reasonable person would have suffered emotional distress under these circumstances.

297. Pursuant to the Federal Tort Claims Act, Defendant United States is liable for the individual defendant CBP officers' actions.

**COUNT 16**
**Negligent Supervision, Hiring, and Retention**
**(by Plaintiff Neisa Ortega against Defendant United States)**

298. All of the foregoing allegations are repeated and re-alleged as though fully set forth herein.

299. Under Massachusetts law, an employer whose employees are in contact with members of the public as part of the employer's business has a duty to exercise reasonable care in the selection and retention of his employees. Foster v. Loft, Inc., 526 N.E.2d 1309, 1310–11 (Mass. App. Ct. 1988).

300. Under Massachusetts law, the tort of negligent supervision, hiring, and retention requires: (1) the employer knew or should have known, before or during the employment, the employee was unfit for employment; and (2) the employer failed to take any further corrective action such as training, investigating, or discharging the employee. Foster v. Loft, Inc., 526 N.E.2d 1309, 1310–11 (Mass. App. Ct. 1988).

301. DHS and CBP owed a duty to Ms. Ortega to exercise reasonable care in the hiring, training, retention, and investigation of individual CBP officers.

302. Based on the repeated conduct by individual defendant CBP officers, DHS and CBP were aware or should have been aware that they employed multiple CBP officers who exhibited tendencies towards excessive use of authority, failure to follow safety procedures, and who posed a substantial risk of harm to Ms. Ortega.

303. Defendants DHS and CBP breached their duties to diligently hire, train, investigate, and terminate multiple CBP officers, and otherwise failed to take corrective action to prevent those officers from continuing to pose a threat.

304. Defendants DHS and CBP knew or should have known that multiple CBP officers were engaging in a pattern of unlawful searches and seizures in violation of clearly established constitutional protections and internal guidance.

305. This pattern of violations and misconduct should have been sufficient to require an investigation, training and/or formal action, or reprimand. Instead, Defendants DHS and CBP retained these officers as employees, providing them with unfettered access to innocent travelers like Ms. Ortega.

306. By their actions, DHS and CBP caused Ms. Ortega to be subject to repeated assaults and multiple episodes of unlawful detention, humiliation, and degradation.

307. Defendants CBP and DHS did not require their employees to follow their own standards of guidance as detailed in TEDS.

308. DHS, CBP, and CBP officers failed to exercise reasonable care in the hiring, supervising, and retention of their employees, which directly and proximately caused Ms. Ortega physical harm and severe emotional distress.

309. Pursuant to the Federal Tort Claims Act, Defendant United States is liable for the individual defendant CBP officers' actions.

### COUNT 17
**Violations of Ms. Ortega's Civil Rights Under Section 1346(b) of FTCA Through Violation of the Massachusetts Civil Rights Act, Mass. Gen. L. c. 12, §§ 11H, 11I.
(by Plaintiff Neisa Ortega against Defendant United States)**

310. The foregoing allegations are re-alleged and incorporated herein by reference.

311.   The Massachusetts Civil Rights Act guarantees all persons' freedom from interference by threats, intimidation or coercion, with the exercise and enjoyment of their rights secured by the Constitution or laws of the United States or the Commonwealth.

312.   Defendants DHS, CBP, and individual CBP officers violated Ms. Ortega's rights under state and federal law to be free from harassment. Multiple CBP officers subjected Ms. Ortega to repeated violations of her right to be free from unreasonable searches and seizures under the Fourth Amendment to the United States Constitution and Article 14 of the Massachusetts Declaration of Rights, through threats, intimidation and/or coercion.

313.   Defendants DHS, CBP, and individual CBP officers violated Ms. Ortega's rights under state and federal law to be free from harassment, and by violating her right to bodily integrity in a manner which shocks the conscience, in violation of the Fifth Amendment to the United States Constitution and Article Ten, Part I of the Massachusetts Declaration of Rights, through threats, intimidation and/or coercion.

314.   As a direct and proximate result of these deprivations of her rights, Ms. Ortega suffered physical injury, indignities, humiliation, severe emotional distress, mental anguish and invasion of bodily integrity.

315.   Pursuant to the Federal Tort Claims Act, Defendant United States is liable for the individual defendant CBP officers' actions.

**COUNT 18**
**False Imprisonment**
**(by Plaintiff N.Z. against Defendant United States)**

316.   The foregoing allegations are re-alleged and incorporated herein by reference.

317.   Under Massachusetts law, the elements of false imprisonment are: (1) intentional and (2) unjustified (3) confinement of a person, (4) directly or indirectly (5) of which the person

confined is conscious or is harmed by such confinement." <u>Ball v. Wal-Mart</u>, Inc., 102 F.

Supp. 2d 44, 55 (D. Mass. 2000).

318.   The defendants intentionally, unlawfully, and unreasonably confined N.Z. during secondary

inspection.

319.   The CBP officers did this on multiple occasions and for prolonged periods of time.

320.   Individual CBP officers prevented N.Z. from leaving by directing her to stay seated and

denying her access to her mother.

321.   N.Z. was harmed by multiple CBP officers' intentional decisions to keep N.Z. separated

from her mother, to interrogate N.Z. without the presence or consent of N.Z.'s mother, and

to intentionally deprive N.Z. of information or assurances of her mother's whereabouts.

322.   The individual CBP officers committed these acts as employees of the United States while

acting in the scope of their employment: they acted within the scope of the general authority

granted to them, in furtherance of their employer's business, and for the accomplishment of

the objectives for which they were hired.

323.   Pursuant to the Federal Tort Claims Act, Defendant United States is liable for the individual

defendant CBP officers' actions.

**COUNT 19**
**Negligence**
**(by Plaintiff N.Z. against Defendant United States)**

324.   The foregoing allegations are re-alleged and incorporated herein by reference.

325.   Under Massachusetts law, negligence requires a showing of: (1) a duty of care to the

plaintiff; (2) a breach of that duty; (3) proximate causation; and (4) damage to the plaintiff.

<u>Bennett v. Eagle Brook Country Store</u>, 557 N.E.2d 1166, 1168 (1990).

326. DHS, CBP, and CBP officers owed N.Z. a heightened duty of care because she was part of an at-risk population, minors. See TEDS 5.0 At-Risk Populations.

327. At the time, N.Z. was a fourteen-year-old child and according to internal CBP standards, "individuals under the age of 18, require additional care or oversight when in the custody of CBP officers." Id. CBP staff are instructed to treat all at-risk populations with dignity, respect and special concern for their particular vulnerability. Id.

328. Defendants United States of America, DHS, and CBP published clearly established standards for individual CBP officers to follow when transporting, escorting, detaining, and searching individuals. Multiple CBP officers did not follow this internal guidance with regards to N.Z. See U.S. Customs and Border Protection, National Standards on Transport, Escort, Detention, and Search (Oct. 2015) (TEDS Rules 1.2, 1.4, 1.8, 1.9, 3.1, 3.3, 3.7, 3.8, 5.6, and 8.0).

329. DHS, CBP, and CBP officers breached their duties by, *inter alia*:

    1. failing to treat N.Z. with dignity and respect;

    2. failing to perform their duties with full respect for individual rights including due process and freedom from unreasonable searches and seizures;

    3. failing to make every effort to keep Ms. Ortega and N.Z. confined together;

    4. unreasonably detaining N.Z.;

    5. leaving N.Z. alone in a public area without supervision for a prolonged period;

    6. unreasonably separating N.Z. from her mother for a prolonged period; and

    7. unreasonably interrogating N.Z. alone.

330. The failure of DHS, CBP, and CBP officers to treat N.Z. with the proper standard of care directly and proximately caused harm, traumatized N.Z., and is the cause of lasting, physically manifested, emotional distress.

331. Pursuant to the Federal Tort Claims Act, Defendant United States is liable for the individual defendant CBP officers' actions.

**COUNT 20**
**Negligent Hiring, Supervision, and Retention**
**(by Plaintiff N.Z. against Defendant United States)**

332. All of the foregoing allegations are repeated and re-alleged as though fully set forth herein.

333. Under Massachusetts law, an employer whose employees are in contact with members of the public as part of the employer's business has a duty to exercise reasonable care in the selection and retention of his employees. Foster v. Loft, Inc., 526 N.E.2d 1309, 1310 (Mass. App. Ct. 1988).

334. Under Massachusetts law, the tort of negligent supervision, hiring, and retention requires: (1) the employer knew or should have known, before or during the employment, the employee was unfit for employment; and (2) the employer failed to take any further corrective action such as training, investigating, or discharging the employee. See Foster v. Loft, Inc., 526 N.E.2d 1309, 1310–11 (Mass. App. Ct. 1988).

335. DHS and CBP owed a duty to N.Z. to exercise reasonable care in the hiring, training, retention, and investigation of individual CBP officers.

336. Based on the repeated conduct by individual defendant CBP officers, DHS and CBP were aware of or should have been aware that they employed multiple CBP officers who exhibited tendencies towards excessive use of authority, failure to follow safety procedures, and posed a substantial risk of harm to N.Z.

337. Defendants DHS and CBP breached their duties to diligently hire, train, investigate, and terminate multiple CBP officers, and otherwise failed to take corrective action to prevent those officers from continuing to pose a threat.

338. Defendants DHS and CBP knew or should have known that multiple CBP officers were engaging in a pattern of unlawful searches and seizures in violation of clearly established constitutional protections and internal guidance.

339. These repeated violations and misconduct against Ms. Ortega and N.Z. should have been sufficient to require an investigation, training and/or formal action, or reprimand. Instead, Defendants DHS and CBP retained these officers as employees, providing them with unfettered access to innocent travelers like N.Z.

340. By their actions, DHS and CBP caused N.Z. to be subject to prolonged confinement, searches of her belongings, invasive interrogation, and two episodes of traumatic separation from her mother.

341. Defendants CBP and DHS did not require their employees to follow their own standards of guidance as detailed in TEDS.

342. DHS, CBP, and CBP officers failed to exercise reasonable care in the hiring, supervising, and retention of their employees, which directly and proximately caused N.Z. severe and lasting emotional distress.

343. Pursuant to the Federal Tort Claims Act, Defendant United States is liable for the individual defendant CBP officers' actions.

**COUNT 21**
**Negligent Infliction of Emotional Distress**
**(by Plaintiff N.Z. against Defendant United States)**

344. The foregoing allegations are re-alleged and incorporated herein by reference.

345.    Under Massachusetts law, the elements of negligent infliction of emotional distress are: (1) the defendant was negligent; (2) the plaintiff suffered emotional distress; (3) the plaintiff's emotional distress was caused by the defendant's negligence; (4) the plaintiff's emotional distress was evidenced by objective, physical symptoms; and (5) a reasonable person would have suffered emotional distress under the circumstances of the case. Payton v. Abbott Labs, 437 N.E.2d 171, 181 (Mass. 1982).

346.    Under Massachusetts law, negligence requires a showing of: (1) a duty of care to the plaintiff; (2) a breach of that duty; (3) proximate causation; and (4) damage to the plaintiff. Bennett v. Eagle Brook Country Store, 557 N.E.2d 1166, 1168 (Mass. 1990).

347.    In a pattern of encounters, individual CBP officers separated N.Z., a minor, from her mother, detained her for lengthy periods of time and interrogated her.

348.    DHS, CBP, and CBP officers were negligent in that they breached their duty of care to N.Z., which directly and proximately caused harm.

349.    N.Z. suffered emotional distress in the form of humiliation, indignity, and desperation as she was separated from her mother and interrogated.

350.    N.Z.'s emotional distress was caused by DHS's, CBP's, and CBP officers' negligence.

351.    N.Z. demonstrated objectively observable physical manifestations of her emotional distress.

352.    A reasonable person would have suffered emotional distress under these circumstances.

353.    Pursuant to the Federal Tort Claims Act, Defendant United States is liable for the individual defendant CBP officers' actions.

**COUNT 22**
**Violations of N.Z.'s Civil Rights Under Section 1346(b) of FTCA Through Violation of the Massachusetts Civil Rights Act, Mass. Gen. L. c. 12, §§ 11H, 11I**
**(by Plaintiff N.Z. against Defendant United States)**

354.    The foregoing allegations are re-alleged and incorporated herein by reference.

355.    The Massachusetts Civil Rights Act guarantees all persons' freedom from interference by threats, intimidation or coercion, with the exercise and enjoyment of their rights secured by the Constitution or laws of the United States or the Commonwealth.

356.    Defendants DHS, CBP, and individual CBP officers violated N.Z.'s rights under state and federal law to be free from harassment by subjecting N.Z. to repeated violations of her right to be free from unreasonable searches and seizures under the Fourth Amendment to the United States Constitution and Article 14 of the Massachusetts Declaration of Rights, through threat, intimidation and/or coercion.

357.    Defendants DHS, CBP, and individual CBP officers violated N.Z.'s rights under state and federal law to be free from harassment, and violated her right to due process in a manner which shocks the conscience, in violation of the Fifth Amendment to the United States Constitution and Article Ten, Part I of the Massachusetts Declaration of Rights, through threats, intimidation and/or coercion.

358.    As a direct and proximate result of these deprivations of her rights, N.Z. suffered humiliation, physical and emotional distress, mental anguish, and lasting traumatization.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs Neisa Ortega and N.Z. respectfully request that this Court enter a judgment against Defendants and award the following relief:

a.    Declare that the actions of Defendants violated Plaintiffs' rights under the Fourth and Fifth Amendments of the U.S. Constitution.

b.    Award damages pursuant to Bivens v. Six Unknown Agents, 403 U.S. 388, 397 (1971) and the Federal Tort Claims Act in an amount to be proven at trial.

c.  Preliminarily and permanently enjoin Defendants and their officers and agents from conducting strip searches or body cavity searches of Ms. Ortega in the absence of a warrant supported by probable cause or reasonable suspicion that drugs or weapons are concealed on her body.

d.  Preliminarily and permanently enjoin Defendants and their officers and agents from separating N.Z. from her mother without compelling justification and explanation as to when they will be reunited.

e.  Award attorneys' fees and litigation costs to Plaintiffs' attorneys.

f.  Grant any and all further relief that the Court deems just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs respectfully demand a jury trial.

Dated: August 2, 2021                          Respectfully submitted,

                                               **NEISA ORTEGA**

                                               By her attorneys,

                                               /s/    Reena Parikh
                                               Reena Parikh, Esq. (BBO# 706891)
                                               Boston College Legal Services LAB
                                               Civil Rights Clinic
                                               885 Centre St,
                                               Newton Centre, MA 02459
                                               (617) 552-0248
                                               parikhre@bc.edu

*BC Law student interns in the Civil Rights Clinic, Elizabeth Gooen and Rebecca Langsam, rendered assistance in the drafting of this Complaint.

/s/  Arielle Sharma___
Arielle Sharma, Esq. (BBO #695980)
Erin Fowler, Esq. (BBO #707188)
Oren Sellstrom, Esq. (BBO #569045)
Lawyers for Civil Rights
61 Batterymarch St.
Boston, MA 02110
(774) 314 9639
asharma@lawyersforcivilrights.org

*Counsel for Plaintiffs*

Dated: August 2, 2021

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants identified on the Notice of Electronic Filing, and to all other parties in accordance with the Federal Rules of Civil Procedure and Local Rules.

/s/ _____