UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| NEISA ORTEGA and N.Z., by her next friend NEISA ORTEGA, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| UNITED STATES CUSTOMS AND BORDER PROTECTION; CBP OFFICERS DOE 1-13; SUPERVISORY CBP OFFICERS DOE 1-3; CBP COMMISSIONER CHRIS MAGNUS, in his official capacity; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; DHS SECRETARY ALEJANDRO MAYORKAS, in his official capacity; and THE UNITED STATES OF AMERICA, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. 21-11250-FDS |
| Defendants. | ) ) | |

**MEMORANDUM AND ORDER ON
<u>DEFENDANTS' MOTION TO DISMISS</u>**

**SAYLOR, C.J.**

This case arises out of allegedly unlawful searches performed by United States Customs and Border Protection ("CBP") at Boston Logan International Airport. Plaintiff Neisa Ortega and her minor daughter, N.Z., have sued CBP, certain CBP officers not yet identified, CBP Commissioner Chris Magnus, the U.S. Department of Homeland Security ("DHS"), DHS Secretary Alejandro Mayorkas, and the United States, asserting violations of the Fourth and Fifth Amendments and various state-law claims under the Federal Tort Claims Act ("FTCA"), 28

U.S.C. § 2671 *et seq.*[1]  They seek money damages as well as injunctive and declaratory relief. Defendants have moved to dismiss Counts 1, 2, 6, 7, 17, and 22 on the ground of sovereign immunity.  For the following reasons, that motion will be granted in part and denied in part.

## I. Background

### A. Factual Background

The following facts are set forth as alleged in the complaint.

#### 1. Parties

Neisa Ortega is a 45-year-old lawful permanent resident of the United States who resides in Massachusetts.  (Compl. ¶ 8).  N.Z. is Ortega's minor daughter and a United States citizen who resides with her mother in Massachusetts.  (*Id.* ¶ 9).

CBP is a federal agency within the Department of Homeland Security that controls United States ports of entry, including Boston Logan International Airport.  (*Id.* ¶¶ 10, 22).

Chris Magnus is the Commissioner for CBP.  (*Id.* ¶ 21).  Alejandro Mayorkas is the Secretary of DHS.  (*Id.* ¶ 23).

The complaint names various "Doe" defendants, all of whom are CBP Officers and Supervisory CBP Officers who were working at Logan Airport at the time of the alleged incidents.  (*Id.* ¶¶ 11-20).  They either allegedly participated in the separation, detention, and questioning of Ortega and N.Z., conducted body cavity and strip searches of Ortega, or supervised those acts.  (*Id.*).

#### 2. Alleged Incidents of Search and Seizure

##### a. April 27, 2019

On April 27, 2019, Ortega and N.Z. flew into Logan Airport from the Dominican

---

[1] Although plaintiffs named Troy A. Miller in the complaint, the Court has substituted the current CBP Commissioner, Chris Magnus, as defendant pursuant to Fed. R. Civ. P. 25(d).

Republic, where they had been visiting family. (*Id.* ¶¶ 43, 186). According to the complaint, they were not carrying illegal drugs or engaging in criminal activity of any kind. (*Id.* ¶ 44). Upon their arrival that morning, CBP officers approached them and led them into a separate room for secondary inspection. (*Id.* ¶¶ 45-47). The officers began opening and inspecting the contents of their suitcases, but the search revealed no evidence of any illegal activity or substances. (*Id.* ¶¶ 49-52). The complaint alleges that the officers then seized their cell phones and passports. (*Id.* ¶ 53). The officers allegedly demanded their cell-phone passwords and searched through their phones, including private text messages. (*Id.* ¶ 54).

After the baggage and cell-phone search was completed, two officers directed Ortega to a smaller, adjoining room, leaving N.Z. behind. (*Id.* ¶ 58). According to the complaint, Ortega was then subjected to a strip search, followed by a visual cavity search of her vaginal and anal areas. (*Id.* ¶¶ 67, 69, 76). CBP Officer Doe 1 allegedly performed two vaginal cavity searches, telling Ortega that because she kept looking back and "interrupting" the search, the entire search process had to be repeated. (*Id.* ¶¶ 77-89). The searches revealed no evidence of any illegal activity or substances. (*Id.* ¶¶ 82, 89). She was thereafter extensively interrogated. (*Id.* ¶ 96). According to the complaint, after three to four hours of confinement, she was released and reunited with N.Z. (*Id.* ¶¶ 98-99).

      **b.**  **September 8, 2019**

On September 8, 2019, Ortega and a friend again flew into Logan Airport from the Dominican Republic, where they had been visiting family. (*Id.* ¶ 101). According to the complaint, Ortega was not carrying illegal drugs or engaging in criminal activity of any kind. (*Id.* ¶ 102). Upon arrival, she was again approached by CBP officers and subjected to secondary inspection. (*Id.* ¶¶ 103-106). She was questioned by multiple officers, who then searched her and her belongings. (*Id.* ¶¶ 107-108). The searches revealed no evidence of any illegal activity

3

or substances. (*Id.* ¶¶ 110, 112). The complaint alleges that after several hours of confinement, she was released. (*Id.* ¶ 113).

### c. March 16, 2020

On March 16, 2020, Ortega again flew into Logan Airport from the Dominican Republic, where she had been visiting family. (*Id.* ¶ 115). According to the complaint, she was not carrying illegal drugs or engaging in criminal activity of any kind. (*Id.* ¶ 116). CBP officers escorted her to a separate room for secondary inspection and searched her luggage, again finding nothing. (*Id.* ¶¶ 117-119). She was subsequently released. (*Id.* ¶ 119).

### d. August 20, 2020

On August 20, 2020, Ortega and N.Z. again flew into Logan Airport from the Dominican Republic, where they had been visiting family. (*Id.* ¶ 121). According to the complaint, they were not carrying illegal drugs or engaging in criminal activity of any kind. (*Id.* ¶ 122). Almost immediately after deplaning, CBP officers approached them and led them into a separate room for secondary inspection. (*Id.* ¶¶ 123-124). Ortega was then separated from N.Z., who was left sitting alone near the baggage-claim area. (*Id.* ¶¶ 125-126, 210-211). Officers searched their suitcases, which revealed nothing illicit. (*Id.* ¶ 131). She was allegedly ordered into a smaller room and began to cry, asking multiple officers why this kept happening to her. (*Id.* ¶¶ 135-137). The complaint alleges that she was thereafter subjected to a strip search; it further alleges that the door was left open so male CBP officers could watch. (*Id.* ¶¶ 139-141). CBP Officer Doe 9 then allegedly performed a vaginal cavity search, again with the door open. (*Id.* ¶¶ 145-153). According to the complaint, after that search revealed nothing, she waited approximately 30 minutes before being escorted into another search room and ordered to strip a second time. (*Id.* ¶¶ 154-160). CBP Officer Doe 9 allegedly performed a second vaginal cavity search as well as a visual inspection of Ortega's vaginal and anal cavities. (*Id.* ¶¶ 162-165). She was

subsequently released to the baggage-claim area, where she met her daughter.  (*Id.* ¶¶ 167-169).

      **3.**    **Aftermath**

According to the complaint, after those incidents, Ortega has experienced lasting trauma, panic attacks, and difficulty sleeping.  (*Id.* ¶¶ 172-175).  It alleges that she is afraid to travel; when she does, she wears pants and does not check her luggage.  (*Id.* ¶¶ 180-183).  Those incidents have also led her to feel isolated, as her regular travel companions are afraid to fly with her.  (*Id.* ¶ 185).

The complaint further alleges that Ortega's daughter, N.Z., has also experienced emotional distress and trauma.  (*Id.* ¶¶ 198-203).  It alleges that she has difficulty sleeping and struggles with angry outbursts and socialization issues as a result of those incidents.  (*Id.* ¶¶ 215-217).

    **B.**    **Procedural Background**

The complaint asserts 22 claims.  Counts 1 and 2 assert claims by Ortega under the Fourth and Fifth Amendment.  (Compl. ¶¶ 225-230).  Counts 3, 4, and 5 assert *Bivens* claims by Ortega for violations of the Fourth and Fifth Amendment.  (*Id.* ¶¶ 231-239).  Counts 6 and 7 assert claims by N.Z. under the Fourth and Fifth Amendment.  (*Id.* ¶¶ 240-243).  Counts 8 and 9 assert *Bivens* claims by N.Z. for violations of the Fourth and Fifth Amendment.  (*Id.* ¶¶ 244-249).  Counts 10 through 17 assert state-law claims by Ortega under the FTCA for assault; battery; false imprisonment; intentional infliction of emotional distress; negligence; negligent infliction of emotional distress; negligent hiring, supervision, and retention; and violations of the Massachusetts Civil Rights Act ("MCRA").  (*Id.* ¶¶ 250-315).  Counts 18 through 22 assert state-law claims by N.Z. under the FTCA for false imprisonment; negligence; negligent hiring, supervision, and retention; negligent infliction of emotional distress; and violations of the MCRA.  (*Id.* ¶¶ 316-358).

Defendants have moved to dismiss Counts 1, 2, 6, 7, 17, and 22 on the ground of sovereign immunity.

## II.     Standard

### A.     Fed. R. Civ. P. 12(b)(1)

On a motion to dismiss for lack of subject-matter jurisdiction, "the party invoking the jurisdiction of a federal court carries the burden of proving its existence." *Johansen v. United States*, 506 F.3d 65, 68 (1st Cir. 2007) (quoting *Murphy v. United States*, 45 F.3d 520, 522 (1st Cir. 1995)).  If the party seeking to invoke federal jurisdiction "fails to demonstrate a basis for jurisdiction," the motion to dismiss must be granted.  *Id.*  When ruling on a motion to dismiss under Rule 12(b)(1), the court "must credit the plaintiff's well-[pleaded] factual allegations and draw all reasonable inferences in the plaintiff's favor." *Merlonghi v. United States*, 620 F.3d 50, 54 (1st Cir. 2010).

### B.     Fed. R. Civ. P. 12(b)(6)

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the complaint must state a claim that is plausible on its face.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). For a claim to be plausible, the "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . ." *Id.* at 555 (internal citations omitted).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556).  When determining whether a complaint satisfies that standard, a court must assume the truth of all well-pleaded facts and give the plaintiff the benefit of all reasonable inferences.  *See Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)).  Dismissal is appropriate if the complaint fails to set forth "factual allegations, either direct or inferential, respecting each

material element necessary to sustain recovery under some actionable legal theory." *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008) (quoting *Centro Medico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1, 6 (1st Cir. 2005)).

## III.     Analysis

The doctrine of sovereign immunity bars suits for money damages against the United States, its agencies, and federal officers sued in their official capacities, unless the government has explicitly waived its immunity. *See McCloskey v. Mueller*, 446 F.3d 262, 272 (1st Cir. 2006). Sovereign immunity is jurisdictional in nature, and the court therefore lacks subject-matter jurisdiction to entertain a suit against the United States without a waiver. *See F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994). A waiver of sovereign immunity must be "unequivocally expressed in statutory text" and strictly construed in the government's favor. *Lane v. Pena*, 518 U.S. 187, 192 (1996). Such a waiver thus may not be implied. *Id.* Furthermore, the plaintiff bears "the burden of proving sovereign immunity has been waived." *Mahon v. United States*, 742 F.3d 11, 14 (1st Cir. 2014).

### A.     Counts 1, 2, 6, and 7

Defendants first have moved to dismiss Counts 1, 2, 6, and 7. Count 1 asserts a Fourth Amendment claim for prolonged detention, strip searches, and body and vaginal cavity searches without reasonable suspicion on behalf of Ortega. Count 2 asserts a Fifth Amendment claim for violations of Ortega's bodily integrity arising from body and vaginal cavity searches. Counts 6 and 7 assert Fourth and Fifth Amendment claims on behalf of N.Z. All four claims are against CBP, DHS, and "All Individual Defendants" in their official capacities.[2] Defendants contend

---

[2] The term "Individual Defendants" is not defined or otherwise specified in the complaint. However, it appears to refer to CBP Commissioner Chris Magnus and DHS Secretary Alejandro Mayorkas in their official capacities. That interpretation is reinforced by plaintiffs' memorandum, which states that "these counts are brought

that those claims are barred by sovereign immunity. Plaintiffs respond that because they are only seeking declaratory and injunctive relief, dismissal is not warranted.

To the extent plaintiffs seek money damages, the Court agrees with defendants that sovereign immunity bars Counts 1, 2, 6, and 7. "[I]n the absence of a specific statutory authorization . . . , the only way in which a suit for damages arising out of constitutional violations attributable to federal action may be brought is under the doctrine of *Bivens*." *Tapia-Tapia v. Potter*, 322 F.3d 742, 746 (1st Cir. 2003). Moreover, *Bivens* claims against federal agencies or officers in their official capacities are not proper. *See id.* ("[T]he Supreme Court has refused to recognize a *Bivens* remedy against federal agencies"); *McCloskey*, 446 F.3d at 272 (*Bivens* does not permit suits against "federal officers sued in their official capacities").

However, plaintiffs contend that they are merely seeking declaratory and injunctive relief.[3] In moving to dismiss, defendants exclusively focused their sovereign-immunity argument on the issue of money damages. *See Tapia-Tapia*, 322 F.3d at 746 (cited by defendants for proposition that "suit for damages arising out of constitutional violations" may only be brought under *Bivens*). Having not otherwise argued that dismissal is warranted on the claims for injunctive and declaratory relief, the Court will deny the motion to dismiss Counts 1, 2, 6, and 7 to the extent those counts seek declaratory and injunctive relief.

---

against DHS, CBP, [Chris Magnus] in his official capacity, and Alejandro Mayorkas in his official capacity, only for declaratory and injunctive relief." (Pls. Opp'n at 3).

[3] Specifically, plaintiffs request that the Court enjoin defendants from conducting strip and body-cavity searches and separating Ortega from N.Z. They also seek declarations that defendants violated their Fourth and Fifth Amendment rights. (*See* Compl. Request for Relief). At this stage, it is sufficient to note that the border search exception to the Fourth Amendment may not be dispositive. Although "[a]gents may perform 'routine' searches at the border without reasonable suspicion, . . . certain 'non-routine' searches must be grounded on reasonable suspicion." *See Alasaad v. Mayorkas*, 988 F.3d 8, 18 (1st Cir. 2021). "Subjecting individuals to strip searches or body-cavity searches are examples of non-routine searches." *Id.*

    B.    <u>Counts 17 and 22</u>

Count 17 asserts an FTCA claim against the United States for violations of Ortega's rights under the MCRA, Mass. Gen. Laws ch. 12, §§ 11H, 11I.  Count 22 asserts the same claim on behalf of N.Z.  Defendants contend that dismissal is warranted because the United States has not waived its sovereign immunity for claims brought pursuant to the MCRA.

"Under settled principles of sovereign immunity, 'the United States, as sovereign, is immune from suit, save as it consents to be sued and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit.'"  *United States v. Dalm*, 494 U.S. 596, 608 (1990) (quoting *United States v. Testan*, 424 U.S. 392, 399 (1976)) (internal quotation marks and alterations omitted); *see also* Charles A. Wright & Arthur R. Miller, 14 Fed. Prac. & Proc. § 3654 (4th ed.) ("[T]he absence of consent by the United States to suit has been treated by courts as a fundamental defect that deprives the district court of subject matter jurisdiction.").

The FTCA acts as a partial waiver of sovereign immunity, rendering the United States liable for certain tort and contract claims.  *See* 28 U.S.C. § 2671 *et seq*.  The grant of jurisdiction to the district courts to hear FTCA claims against the United States is coextensive with the act's waiver of sovereign immunity.  Thus, actions that do not fall under the express terms of the FTCA's waiver must be dismissed for lack of subject-matter jurisdiction.  *Id*.; *Wood v. United States*, 290 F.3d 29, 35 (1st Cir. 2002).

Under the FTCA, the United States may be liable for "injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b)(1).

Here, Counts 17 and 22 are brought pursuant to the FTCA, alleging state-law violations

of the MCRA, Mass. Gen. Laws ch. 12, §§ 11H, 11I.  The MCRA provides a right of action to any person whose exercise or enjoyment of rights secured by the federal or state constitution or laws has been interfered with by "threats, intimidation or coercion."  *Id.*  The complaint asserts violations of Ortega and N.Z.'s rights under the Fourth and Fifth Amendment as well as Articles 10 and 14 of the Massachusetts Declaration of Rights.  (Compl. ¶¶ 312-313, 356-357).

Defendants contend that those claims must be dismissed because the United States has not waived its sovereign immunity for claims brought under the MCRA.  Specifically, they assert that "the United States simply has not rendered itself liable under § 1346(b) for constitutional tort claims."  *Meyer*, 510 U.S. at 478; *see also Villanueva v. United States*, 662 F.3d 124, 127 (1st Cir. 2011) (finding that federal constitutional tort claims are not cognizable under the FTCA because "state law [is] the source of substantive liability under the FTCA"); *Crooker v. United States*, 2010 WL 3860597, at *8 (D. Mass. Sept. 29, 2010) (noting that "*Bivens* is the method by which constitutional tort claims are brought, while claims for negligence and certain intentional (but not constitutional) torts are brought under the FTCA").

*Meyer* and *Villanueva* involved claims for violations of federal constitutional rights.  Neither case directly addresses the question presented here—whether plaintiffs can assert state-law MCRA claims premised on violations of federal constitutional rights.  Nonetheless, dismissal of those claims is required.  Permitting a federal constitutional claim to proceed indirectly under state law, when it cannot proceed directly under federal law, would eviscerate the principles of *Meyer* and *Villanueva*.

It is true that an older case from this District, *Adedeji v. United States,* 782 F. Supp. 688, 702-03 (D. Mass. 1992), reached an opposite conclusion.  There, the plaintiff was subjected to a strip search and body cavity inspection by U.S. customs officials at Logan Airport after returning

from Nigeria. She brought claims under *Bivens*, and the court later allowed her to amend the complaint by adding an FTCA claim based on violations of the MCRA. *Id.* at 690. That FTCA claim incorporated violations of both federal and state constitutional rights. *Id.* at 703. After a bench trial on the FTCA claim, the court held that the plaintiff had "established her case under the MCRA as brought to this Court through the auspices of the Federal Tort Claims Act." *Id.* at 702.

The *Adedeji* decision does not discuss sovereign immunity, and therefore it is unclear whether the issue was before the court. More critically, *Meyer* had not been decided by the Supreme Court until 1994, two years after *Adedeji*. For those reasons, *Adedeji* is not persuasive authority and will not be followed here.

In *Plascencia v. United States*, the court considered an FTCA claim premised on California's analogue to the MCRA, the Bane Act. 2018 WL 6133713, at *11-14 (C.D. Cal. May 25, 2018). The Bane Act authorizes claims against persons who interfere, by threats, intimidation, or coercion, with an individual's exercise or enjoyment of rights secured by the federal or state constitution or laws. *See* Cal. Civ. Code § 52.1. Like Ortega, the plaintiff in *Plascencia* asserted violations of the Fourth and Fifth Amendment, as well as rights secured by the California constitution. *Id.* at *13. The court concluded that it lacked subject-matter jurisdiction over the portion of the claim premised on interference with Fourth and Fifth Amendment rights because the "United States has immunity and has not waived its immunity pursuant to the FTCA." *Id.* The Court agrees with that analysis and will accordingly dismiss Counts 17 and 22 to the extent they allege interference with plaintiffs' rights under the federal Constitution.

The question remains whether an FTCA claim can be asserted against the United States

under the MCRA for alleged violations of the Massachusetts Declaration of Rights.  There is substantial doubt about whether such a claim is proper under the FTCA.  *See Hernandez v. United States*, 939 F.3d 191, 205 (2d Cir. 2019) (agreeing with courts that have dismissed FTCA claims for violations of New York's constitution because "it does not make sense that [plaintiff] should be able to pursue a state due process claim when he cannot pursue a federal due process claim").  However, the Court need not reach that issue because dismissal is warranted for another reason.

To survive a motion to dismiss under the MCRA, the complaint must allege that a defendant threatened, intimidated, or coerced the plaintiff into "giv[ing] up something that [she] had] the constitutional right to do."  *Pimentel v. City of Methuen*, 323 F. Supp. 3d 255, 272 (D. Mass. 2018) (quoting *Goddard v. Kelley*, 629 F. Supp. 2d 115, 128 (D. Mass. 2009)) (internal quotation marks omitted).

Even assuming plaintiffs' rights under Article 10 and 14 of the Massachusetts Declaration of Rights were violated, Counts 17 and 22 still fail to state a claim.  Although the complaint states in general terms that plaintiffs' rights were violated through "threats, intimidation and/or coercion," (*see* Compl. ¶¶ 312-313, 356-357), it does not allege that they were threatened, intimidated, or coerced into *giving up* those state constitutional rights.  Rather, the alleged violations of bodily integrity and the allegedly unreasonable searches and seizures were themselves the alleged wrongdoing.  The Supreme Judicial Court has held that "[a] direct violation of a person's rights does not by itself involve threats, intimidation, or coercion and thus does not implicate the [MCRA]."  *See Longval v. Comm'r of Corr.*, 404 Mass. 325, 333 (1989).

Accordingly, the Court will also dismiss Counts 17 and 22 to the extent they allege interference with plaintiffs' rights under the Massachusetts Declaration of Rights.

## IV. Conclusion

For the foregoing reasons, defendants' motion to dismiss is GRANTED as to Counts 17 and 22, and Counts 1, 2, 6, and 7 insofar as they seek money damages, and is otherwise DENIED.

**So Ordered.**

Dated: July 14, 2022

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
Chief Judge, United States District Court