**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **NEISA ORTEGA and N.Z., by her next friend NEISA ORTEGA,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**UNITED STATES CUSTOMS AND BORDER PROTECTION; LARISSA SYDOR; COLLEEN DOWNEY; MARY DAVISON; JESSICA CROALL; KIMBERLY CARROLL; IGNACIO TAURONI; CBP OFFICERS DOES 3-7, 8, 12-13; BRETT SWEET; CARRIE ACOSTA; DANIEL OUELLETTE; CBP COMMISSIONER CHRIS MAGNUS, in his official capacity; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; DHS SECRETARY ALEJANDRO MAYORKAS, in his official capacity; and THE UNITED STATES OF AMERICA,**<br><br>**Defendants.** | ) | **Civil Action No. 21-11250-FDS** |

**MEMORANDUM AND ORDER ON**
**<u>DEFENDANTS' MOTION TO DISMISS</u>**

**SAYLOR, C.J.**

This case arises out of allegedly unlawful searches and seizures performed by United States Customs and Border Protection ("CBP") agents at Boston Logan International Airport. Plaintiff Neisa Ortega and her minor daughter, N.Z., have brought suit against CBP, certain CBP officers, CBP Commissioner Chris Magnus, the U.S. Department of Homeland Security ("DHS"), DHS Secretary Alejandro Mayorkas, and the United States, asserting violations of the

Fourth and Fifth Amendments and various state-law claims under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq*. The complaint asserts claims both against law enforcement officers in their individual capacities and against government agencies and officers in their official capacities. It seeks money damages as well as injunctive and declaratory relief.

On July 14, 2022, the Court granted defendants' motion to dismiss Counts 17 and 22 and Counts 1, 2, 6, and 7 to the extent that they sought money damages. Plaintiffs then filed, with leave of court, an amended complaint.[1] The individual officer defendants (Larissa Sydor, Colleen Downey, Mary Davison, Jessica Croall, Kimberly Carroll, Ignacio Tauroni, Brett Sweet, Carrie Acosta, and Daniel Ouellette) have now moved to dismiss all claims against them on the ground that they fail to state a claim upon which relief can be granted.

The first question is whether the complaint states a claim for money damages against the officers in their individual capacities. In substance, defendants contend that under the Supreme Court's decision in *Egbert v. Boule,* 142 S. Ct. 1793 (2022), there is no implied cause of action against federal agents under the Fourth and Fifth Amendments arising out of searches or seizures occurring at the border. As to that issue, the Court agrees.

Plaintiff's claims against the individual officers fall into a gap in private civil-rights enforcement that Congress has (thus far, at least) declined or neglected to fill. Claims against state and local law enforcement officers seeking money damages for violations of constitutional rights may be brought under 42 U.S.C. § 1983. There is, however, no comparable statute applicable to constitutional claims against federal officers.

In 1971, the Supreme Court created such a cause of action in *Bivens v. Six Unknown*

[1] The amended complaint purports to re-assert the claims for money damages in Counts 1, 2, 6, and 7 that the Court had previously dismissed, as well as the state-law claims set forth in Counts 17 and 22.

*Named Agents*, 403 U.S. 388 (1971). Over the last four decades, however, the Supreme Court has grown increasingly uncomfortable with *Bivens* and its progeny, reasoning that the creation of new causes of action is properly a task for Congress, not the judiciary. As of this writing, *Bivens* has not yet been overruled, but it has been substantially narrowed to a small category of cases—indeed almost to the vanishing point. Congress has not, however, enacted new legislation in response to those developments.

The complaint here, in part, seeks money damages against CBP officers arising out of allegedly unlawful searches and seizures on two individuals entering the United States at an international airport. To the extent that the damages claims are asserted against the officers in their individual capacities, they are clearly foreclosed by the Supreme Court's decision in *Egbert*.

The next question is whether the complaint states a claim for money damages against those officers acting in their official capacities. Those claims are clearly barred by sovereign immunity.

What remains are the claims for declaratory and injunctive relief. Defendants did not address those issues in its motion to dismiss, and the Court is reluctant to do so here without the benefit of full briefing, and perhaps the development of an evidentiary record. Accordingly, and for the following reasons, the motion to dismiss will be granted in part and denied in part.

## I. <u>Background</u>

### A. <u>Factual Background</u>

The following facts are set forth as alleged in the amended complaint.

#### 1. <u>Parties</u>

Neisa Ortega is a 45-year-old lawful permanent resident of the United States who resides in Massachusetts. (Am. Compl. ¶ 8). N.Z. is Ortega's minor daughter and a United States

citizen who resides with her mother in Massachusetts. (*Id.* ¶ 9).

Customs and Border Protection ("CBP") is a federal agency within the Department of Homeland Security that controls United States ports of entry, including Boston Logan International Airport. (*Id.* ¶ 10).

Chris Magnus is the Commissioner for CBP. (*Id.* ¶ 24). Alejandro Mayorkas is the Secretary of DHS. (*Id.* ¶ 26).

Larissa Sydor, Colleen Downey, Brett Sweet, Carrie Acosta, Jessica Croall, Mary Davidson, Kimberly Carroll, Ignacio Tauroni, and Daniel Ouellette were CBP officers during the events described in the complaint. (*Id.* ¶¶ 11, 12, 14, 15, 16, 17, 19, 20, 21).

The complaint names various "Doe" defendants, all of whom are CBP Officers and Supervisory CBP Officers who were working at Logan Airport at the time of the alleged incidents. (*Id.* ¶¶ 13-23). They either allegedly participated in the separation, detention, and questioning of Ortega and N.Z., conducted body cavity and strip searches of Ortega, or supervised those acts. (*Id.*).

**2. <u>Alleged Incidents of Search and Seizure</u>**

**a. <u>April 27, 2019</u>**

On April 27, 2019, Ortega and N.Z. flew into Logan Airport from the Dominican Republic, where they had been visiting family. (*Id.* ¶¶ 46). According to the complaint, they were not carrying illegal drugs or engaging in criminal activity of any kind. (*Id.* ¶ 47). Upon their arrival that morning, CBP officers approached them and led them into a separate room for secondary inspection. (*Id.* ¶¶ 48-50). The officers began opening and inspecting the contents of their suitcases, but the search revealed no evidence of any illegal activity or substances. (*Id.* ¶¶ 52-55). The complaint alleges that the officers then seized their cell phones and passports. (*Id.* ¶ 56). The officers allegedly demanded their cell phone passwords and searched

through their phones, including private text messages. (*Id.* ¶ 57).

After the baggage and cell phone search was completed, two officers (Sydor and Downey) directed Ortega to a smaller, adjoining room, leaving N.Z. behind. (*Id.* ¶ 61). According to the complaint, Ortega was then subjected to a strip search, followed by a visual cavity search of her vaginal and anal areas. (*Id.* ¶¶ 70, 72, 79). CBP Officer Sydor allegedly performed two vaginal cavity searches, telling Ortega that because she kept looking back and "interrupting" the search, the entire search process had to be repeated. (*Id.* ¶¶ 85-86). The searches revealed no evidence of any illegal activity or substances. (*Id.* ¶¶ 84, 91). She was thereafter interrogated by approximately seven CBP officers. (*Id.* ¶ 98-99). According to the complaint, after three to four hours of confinement, she was released and reunited with N.Z. (*Id.* ¶¶ 100-01).

**b. <u>September 8, 2019</u>**

On September 8, 2019, Ortega and a friend again flew into Logan Airport from the Dominican Republic, where they had been visiting family. (*Id.* ¶ 103). According to the amended complaint, Ortega was not carrying illegal drugs or engaging in criminal activity of any kind. (*Id.* ¶ 104). Upon arrival, she was again approached by multiple CBP officers and subjected to a secondary inspection. (*Id.* ¶¶ 105-16). She was questioned by multiple officers, who then searched her and her belongings. (*Id.* ¶¶ 110-11). The searches revealed no evidence of any illegal activity or substances. (*Id.* ¶¶ 112, 115). The complaint alleges that after several hours of confinement, she was released. (*Id.* ¶ 116).

**c. <u>March 16, 2020</u>**

On March 16, 2020, Ortega again flew into Logan Airport from the Dominican Republic, where she had been visiting family. (*Id.* ¶ 118). According to the complaint, she was not carrying illegal drugs or engaging in criminal activity of any kind. (*Id.* ¶ 119). CBP officers

escorted her to a separate room for secondary inspection and searched her luggage, again finding nothing. (*Id.* ¶¶ 120-22). She was subsequently released. (*Id.* ¶ 122).

**d. <u>August 20, 2020</u>**

On August 20, 2020, Ortega and N.Z. again flew into Logan Airport from the Dominican Republic, where they had been visiting family. (*Id.* ¶ 124). According to the amended complaint, they were not carrying illegal drugs or engaging in criminal activity of any kind. (*Id.* ¶ 125). Almost immediately after deplaning, CBP officers approached them and led them into a separate room for secondary inspection. (*Id.* ¶¶ 126-27). Ortega was then separated from N.Z., who was left sitting alone near the baggage-claim area. (*Id.* ¶¶ 128-29). Officers searched their suitcases, which revealed nothing illicit. (*Id.* ¶ 134). She was allegedly ordered into a smaller room and began to cry, asking multiple officers why this kept happening to her. (*Id.* ¶¶ 138-39). The complaint alleges that she was thereafter subjected to a strip search; it further alleges that the door was left open and male CBP officers were watching from the adjoining room. (*Id.* ¶¶ 143-44). Sydor then allegedly performed a vaginal cavity search, again with the door open. (*Id.* ¶¶ 152). According to the complaint, after that search revealed nothing, she waited approximately 30 minutes before being escorted into another search room and ordered to strip a second time. (*Id.* ¶¶ 157-66). Sydor allegedly performed a second vaginal cavity search as well as a visual inspection of Ortega's vaginal and anal cavities. (*Id.* ¶¶ 166-67). She was subsequently released to the baggage-claim area, where she met her daughter. (*Id.* ¶¶ 171-74).

**3. <u>Aftermath</u>**

According to the complaint, after those incidents, Ortega has experienced lasting trauma, panic attacks, and difficulty sleeping. (*Id.* ¶¶ 175-81). It alleges that she is afraid to travel; when she does, she wears pants and does not check her luggage. (*Id.* ¶¶ 182-85). Those incidents have also led her to feel isolated, as her regular travel companions are afraid to fly with her.

(*Id.* ¶ 188).

The complaint alleges that Ortega's daughter, N.Z., has also experienced emotional distress and trauma. (*Id.* ¶¶ 217-19). It alleges that she has difficulty sleeping and struggles with angry outbursts and socialization issues because of those incidents. (*Id.* ¶¶ 219-21).

**B. <u>Procedural Background</u>**

The amended complaint asserts 22 claims. Counts 1 and 2 assert claims by Ortega against CBP, DHS, and the individual defendants in their official capacities under the Fourth and Fifth Amendments, respectively. (Am. Compl. ¶¶ 228-33). Counts 3, 4, and 5 assert *Bivens* claims by Ortega against the individual officers in their individual capacities for violations of the Fourth and Fifth Amendments. (*Id.* ¶¶ 234-41). Counts 6 and 7 assert claims by N.Z. against CBP, DHS, and the individual defendants in their official capacities under the Fourth and Fifth Amendments, respectively. (*Id.* ¶¶ 242-45). Counts 8 and 9 assert *Bivens* claims by N.Z. against the individual officers in their individual capacities for violations of the Fourth and Fifth Amendments. (*Id.* ¶¶ 246-51). Counts 10 through 17 assert state-law claims by Ortega under the FTCA for assault; battery; false imprisonment; intentional infliction of emotional distress; negligence; negligent infliction of emotional distress; negligent hiring, supervision, and retention; and violations of the Massachusetts Civil Rights Act ("MCRA"). (*Id.* ¶¶ 252-317). Counts 18 through 22 assert state-law claims by N.Z. under the FTCA for false imprisonment; negligence; negligent supervision, hiring, and retention; negligent infliction of emotional distress; and violations of the MCRA. (*Id.* ¶¶ 318-60).

The individual defendants have moved to dismiss Counts 3, 4, 5, 8, and 9 (the Fourth and Fifth Amendment claims and official capacity claims) on the ground that recognizing plaintiffs' causes of action would be an expansion of *Bivens* inconsistent with the Supreme Court's decision in *Egbert v. Boule*. They also move to dismiss Counts 1, 2, 6, and 7 on the ground that sovereign

immunity bars claims for money damages against federal agencies and officers in their official capacities.

## II. Legal Standard

On a motion to dismiss, the court "must assume the truth of all well-plead[ed] facts and give . . . plaintiff the benefit of all reasonable inferences therefrom." *Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)). To survive a motion to dismiss, the complaint must state a claim that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In other words, the "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555 (citations omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556). Dismissal is appropriate if the complaint fails to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008) (quoting *Centro Medico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1, 6 (1st Cir. 2005)).

## III. Analysis

In *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), the Supreme Court created a civil damages action against federal officials for violations of the Fourth Amendment. The Court subsequently created new causes of action under the Fifth Amendment, *see Davis v. Passman*, 442 U.S. 228 (1979), and the Eighth Amendment, *see Carlson v. Green*, 446 U.S. 14 (1980).

Since that time, however, the availability of *Bivens*-type causes of action has been

narrowly circumscribed, as the Supreme Court has expressed considerable misgivings about possible encroachment on legislative powers. "Over the past 42 years, [the Supreme Court has] declined 11 times to imply a similar [*Bivens*] cause of action for other alleged constitutional violations." *Egbert v. Boule*, 142 S. Ct. 1793, 1800 (2022) (citations omitted). Indeed, the Court has "emphasized that recognizing a cause of action under *Bivens* is 'a disfavored judicial activity.'" *Id.* at 1803 (quoting *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1856-57 (2017)).

Analysis of a proposed *Bivens* claim involves a two-step inquiry. *Egbert*, 142 S. Ct. at 1803. The first question is whether the case presents a "new *Bivens* context"—that is, whether it is meaningfully different from the three cases in which the Supreme Court has recognized an implied damages remedy. *Id*. The second question is whether, if it does present a new context, there are "special factors" indicating that the judiciary is at least arguably less equipped than Congress to weigh the costs and benefits of allowing a damages action to proceed. *Id*. "If there is even a single 'reason to pause before applying *Bivens* in a new context,' a court may not recognize a *Bivens* remedy." *Id.*

"[The two] steps often resolve to a single question: whether there is any reason to think that Congress might be better equipped to create a damages remedy." *Id.* at 1803. Ultimately, the existence of "*any* rational reason (even one) to think that *Congress* is better suited" to create a cause of action forecloses an extension of *Bivens*. *Id.* at 1805 (emphasis in original).[2]

---

[2] The First Circuit, before *Ziglar* and *Egbert*, construed *Bivens* claims with some generality. For example, in *DeMayo v. Nugent*, 517 F.3d 11 (1st Cir. 2008), the court held that a plaintiff could assert a Fourth Amendment claim under *Bivens* by proving a "violation of a constitutional right by a federal agent acting under the color of federal law." 517 F.3d at 14. Because the plaintiff had shown that federal officers had entered his home without a warrant, consent, or exigent circumstances, the court held that he had established a *Bivens* claim based on the officers' violation of the Fourth Amendment. *Id.* at 14-17. The First Circuit did not compare the facts of the case with those of *Bivens*. After *Ziglar*, and before *Egbert*, the court noted the Supreme Court's "reluctance to extend the *Bivens* doctrine to new settings" and declined to extend *Bivens* in a case that "differ[ed] meaningfully" from the original facts of *Bivens*. *González v. Mesa*, 864 F.3d 45, 52, 53 (1st Cir. 2017) (holding that plaintiffs' status as federal employees and the absence of a home search were meaningful differences from *Bivens*). The First Circuit

### A. <u>Individual-Capacity Claims for Money Damages - Counts 3, 4, 5, 8, and 9</u>

Defendants have moved to dismiss Counts 3, 4, 5, 8, and 9, all of which are *Bivens* claims seeking money damages against individual officers. Count 3 asserts a Fourth Amendment violation against unreasonable searches, brought under *Bivens* against individual CBP officers in their official capacities on behalf of Ortega. Count 4 asserts a Fourth Amendment violation against unreasonable seizures brought under *Bivens* against individual CBP officers in their official capacities on behalf of Ortega. Count 5 asserts a Fifth Amendment violation for deprivation of due process brought under *Bivens* against CBP officers in their official capacities on behalf of Ortega. Count 8 asserts a Fourth Amendment violation against unreasonable seizures brought under *Bivens* against individual CBP officers in their official capacities on behalf of N.Z. Count 9 asserts a Fifth Amendment violation for deprivation of due process brought under *Bivens* against CBP officers in their official capacities on behalf of N.Z. Defendants contend that the Supreme Court's decision in *Egbert* forecloses all such claims.

#### 1. <u>Fourth Amendment Claims</u>

Plaintiffs contend that their Fourth Amendment claims arise do not arise in a new *Bivens* context. They assert that the foundational elements of their claims—seizure by federal officers, separation of the plaintiffs from each other, and performance of a warrantless and unreasonable strip search without probable cause—"factually mirror" those of the plaintiff in *Bivens*. (Pl. Mem. at 5). To a large degree, that is true, but there is a very substantial distinction that requires a different outcome: the searches and seizures here were conducted by Border Patrol agents at the United States border.

---

has not yet addressed the impact of *Egbert* on that jurisprudence, but it is highly doubtful that *DeMayo* remains good law in all respects.

In *Hernández v. Mesa*, 140 S. Ct. 735 (2020), the Supreme Court "declined to create a damages remedy for an excessive-force claim against a Border Patrol agent who shot and killed a 15-year-old Mexican national across the border in Mexico." *Egbert*, 142 S. Ct. at 1804. As the *Egbert* Court explained, "We did not recognize a *Bivens* action there because regulating the conduct of agents at the border unquestionably has national security implications, and the risk of undermining border security provides reason to hesitate before extending *Bivens* into this field." *Id*. (internal quotations omitted).

*Egbert* likewise involved a claim against a Border Patrol officer. The Court found that the reasoning of *Hernández* applied "with equal force." *Id*.

> During the alleged altercation with [the plaintiff], Agent Egbert was carrying out Border Patrol's mandate to interdict persons attempting to illegally enter or exit the United States or goods being illegally imported into or exported from the United States. Because matters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention, we reaffirm that a *Bivens* cause of action may not lie where, as here, national security is at issue.
>
> . . . [H]ere, no less than in *Hernández*, the Judiciary is not undoubtedly better positioned than Congress to authorize a damages action in this national security context. That this case does not involve a cross-border shooting, as in *Hernández*, but rather a more conventional excessive-force claim, as in *Bivens*, does not bear on the relevant point. Either way, the Judiciary is comparatively ill suited to decide whether a damages remedy against any Border Patrol agent is appropriate.

*Id*. at 1805-06 (quotations and internal citations omitted).[3]

Here, the allegedly unlawful searches and seizures were conducted by CBP officers at Logan Airport, and were directed to individuals entering the United States from the Dominican Republic. The fact that they allegedly involved, among other things, highly intrusive body

---

[3] Courts have long recognized that the government has a strong national-security interest in searches at the border. *See United States v. Montoya de Hernandez*, 473 U.S. 531, 544 (1985) ("At the border, customs officials have more than merely an investigative law enforcement role. They are also charged, along with immigration officials, with protecting this Nation from entrants who may bring anything harmful into this country."); *Alasaad v. Mayorkas*, 988 F.3d 8, 19 (1st Cir. 2021).

cavity searches, rather than the shooting death of a 15-year-old boy (as in *Hernández*) or a physical altercation (as in *Egbert*) "does not bear on the relevant point." 142 S. Ct. at 1806. They were searches and seizures at the border, and therefore fall squarely within the scope of *Egbert*.

Under the circumstances, the Court finds that the Fourth Amendment claims asserted here represent an unwarranted extension of *Bivens* to a new context, and therefore fail to state a claim upon which relief can be granted. Counts 3, 4, and 8 will accordingly be dismissed.

**2. <u>Fifth Amendment Claims</u>**

The Fifth Amendment claims asserted here in Counts 5 and 9 likewise involve a proposed extension of Bivens to a new context. In *Davis v. Passman*, the Supreme Court created a cause of action under the Due Process Clause of the Fifth Amendment in a case brought by an administrative assistant against a congressman, alleging sex discrimination in his firing her. 442 U.S. 228, 235 (1979). The claims here, while rooted in the Due Process Clause, differ in several meaningful ways from that recognized in *Davis*. Defendants are CBP officers, not congressmen; plaintiffs were, respectively, subjected to an invasive search and separated from a parent, not fired; and the alleged actions took place in an airport during a CBP inspection, not in a congressional office in Washington, D.C. The Fifth Amendment claims therefore unquestionably arise in a new *Bivens* context, and accordingly Counts 5 and 9 will be dismissed.

**B. <u>Official-Capacity Claims for Money Damages - Counts 1, 2, 6, and 7</u>**

Defendants also have moved to dismiss Counts 1, 2, 6, and 7, which are asserted against CBP, DHS, and "All Individual Defendants" in their official capacities.[4] Count 1 asserts a

[4] As noted, the Court dismissed Counts 1, 2, 6, and 7 in the original complaint to the extent they sought money damages. The amended complaint nonetheless re-asserts the same claims.

The term "Individual Defendants" is not defined or otherwise specified in the complaint. However, it appears to refer to CBP Commissioner Chris Magnus and DHS Secretary Alejandro Mayorkas in their official

Fourth Amendment claim for prolonged detention, strip searches, and body and vaginal cavity searches without reasonable suspicion on behalf of Ortega. Count 2 asserts a Fifth Amendment claim for violations of Ortega's bodily integrity arising from body and vaginal cavity searches. Counts 6 and 7 assert Fourth and Fifth Amendment claims on behalf of N.Z.

Defendants contend that those claims are barred by sovereign immunity. To the extent that plaintiffs seek money damages, the Court agrees. "[I]n the absence of a specific statutory authorization . . . , the only way in which a suit for damages arising out of constitutional violations attributable to federal action may be brought is under the doctrine of *Bivens*." *Tapia-Tapia v. Potter*, 322 F.3d 742, 746 (1st Cir. 2003). Moreover, *Bivens* claims may not be asserted against federal agencies or officers in their official capacities. *See id.* ("[T]he Supreme Court has refused to recognize a *Bivens* remedy against federal agencies."); *McCloskey v. Mueller*, 446 F.3d 262, 272 (1st Cir. 2006) (holding that *Bivens* does not permit suits against "federal officers sued in their official capacities").

**C. <u>Claims for Injunctive and Declaratory Relief</u>**

Whether plaintiffs may assert claims for prospective injunctive relief against federal officers to prevent future violations is a different matter, as are their claims for declaratory relief.[5] Those questions present substantial legal issues, potentially including issues of standing and the limits of judicial power. *See, e.g.*, *Shain v. Ellison*, 356 F.3d 211, 215-16 (2d Cir. 2004)

---

capacities. That interpretation is reinforced by plaintiffs' memorandum, which states that "these counts are brought against DHS, CBP, [Chris Magnus] in his official capacity, and Alejandro Mayorkas in his official capacity, only for declaratory and injunctive relief." (Pl. Mem. at 3).

[5] Specifically, plaintiffs request that the Court enjoin defendants from "conducting strip searches or body cavity searches of Ms. Ortega in the absence of a warrant supported by probable cause or reasonable suspicion that drugs or weapons are concealed on her body" and "separating N.Z. from her mother without compelling justification and explanation as to when they will be reunited." (Compl. Request for Relief). They also seek declarations that defendants violated their rights under the Fourth and Fifth Amendments. (*Id.*).

(dismissing, for lack of standing, claim for prospective relief enjoining a policy of strip-searching misdemeanor admittees to a county jail); *Jibril v. Mayorkas*, 20 F.4th 804, 812-13 (D.C. Cir. 2021) (reversing dismissal of claim for prospective relief enjoining border detention and searches of family members alleged to have been improperly placed on a terrorist watch list maintained by the government).

Unlike the plaintiff in *Shain*, plaintiffs here are not seeking to enjoin the future application of a statute, a regulation, or a government policy. And unlike the plaintiffs in *Jibril*, they do not allege that they have been improperly placed on a government watch list. Instead, they seek to enjoin future discretionary actions by law enforcement agents. Those future actions might be searches and seizures conducted without reasonable suspicion—but they might also be reasonable searches, based on observations of officers at the scene, or on confidential information, such as wiretaps or tips from informants. It is unclear at this stage whether the injunction plaintiffs seek would be workable or even lawful.p It is at least possible that some more limited form of injunction might be available and appropriate under the circumstances, but the complaint does not actually seek any such relief.

In any event, the issues of declaratory and injunctive relief were not addressed by the government in its memorandum. Whether such relief is available, in whole or in part, is not a question that the Court is willing to resolve without, at a minimum, appropriate briefing (and, potentially, some form of evidentiary record).

The Court will therefore deny the motion to dismiss without prejudice to the extent that Counts 1-9 seek declaratory and injunctive relief.

## IV. Conclusion

For the foregoing reasons, the motion of defendants Larissa Sydor, Colleen Downey, Mary Davison, Jessica Croall, Kimberly Carroll, Ignacio Tauroni, Brett Sweet, Carrie Acosta, and Daniel Ouellette to dismiss the claims against them in Counts 1 through 9 is GRANTED to the extent those counts seek money damages, and is otherwise DENIED without prejudice.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
Chief Judge, United States District Court

Dated: February 23, 2023