# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

NEISA ORTEGA; and N.Z. *by her next friend, Neisa Ortega,*

        Plaintiffs,

v.

UNITED STATES CUSTOMS AND BORDER PROTECTION; LARISSA SYDOR; COLLEEN DOWNEY; MARY DAVISON; JESSICA CROALL; KIMBERLY CARROLL; IGNACIO TAURONI; CBP OFFICERS DOE 3-7, 8, 12-13; BRETT SWEET; CARRIE ACOSTA; DANIEL OUELLETTE; ACTING CBP COMMISSIONER TROY MILLER[1], *in his official capacity;* UNITED STATES DEPARTMENT OF HOMELAND SECURITY; DHS SECRETARY ALEJANDRO MAYORKAS, *in his official capacity;* and the UNITED STATES OF AMERICA,

        Defendants.

Civil Action No. 21-11250-FDS

## DEFENDANTS' REPLY
## TO PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION TO COMPEL

## I.    INTRODUCTION

On April 27, 2019, as Plaintiffs Neisa Ortega and her daughter, N.Z., entered the United States at Boston's Logan Airport (Logan Airport), U.S. Customs and Border Protection (CBP) referred Plaintiffs to secondary inspection for an interview and baggage exam based upon

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Acting Commissioner Troy Miller is automatically substituted as a defendant in place of former Commissioner Magnus.

intelligence from the United States Drug Enforcement Administration (DEA) in a TECS[2] lookout indicating that Ms. Ortega may be internally smuggling narcotics.  (TECS Report at GOV000010-12, 19-20).[3]  During her interview in secondary inspection, Ms. Ortega stated that she went to the Dominican Republic (DR) for a family reunion and stayed with her husband, Eskiel Lopez, whom she recently married and who lived in the DR.  (TECS Report at GOV000020).  She was unable to provide CBP officers with her husband's address in the DR, and she traveled between the DR and the United States with two, one-way tickets purchased by her sister-in-law but charged to Ms. Ortega's credit card.  *Id*.

After her interview, Ms. Ortega was escorted to a private inspection room, where a two-minute pat-down search was conducted by CBP Officer Larissa Sydor, and witnessed by CBP Officer Colleen Downey.  (TECS Report at GOV000019, 21).  Because Ms. Ortega's jeans were thick and tight, Officer Sydor was unable to complete a pat-down search of Ms. Ortega's groin area, and a partial body search of Ms. Ortega was requested.  *Id*.  Supervisory CBP Officer Brett Sweet authorized the partial body search based upon the DEA intelligence, for officer safety, and due to the officers' physical observations of Ms. Ortega.  (TECS Report at GOV000019).  Once approved, Officer Sydor conducted Ms. Ortega's partial body search, which lasted three minutes with negative results.  (TECS Report at GOV000019, 21, 754).  CBP then provided water to Ms. Ortega, and a water, juice box and granola bar to N.Z.  *Id*.

---

[2] TECS is an updated and modified version of the former Treasury Enforcement Communications System, CBP's principal law enforcement and anti-terrorism database system. *See* TECS System of Records Notice, 73 Fed. Reg. 77778 (Dec. 19, 2008).

[3] Documents referenced by Bates number in this pleading have been produced in discovery pursuant to a protective order in this case.  Defendants will separately file a motion requesting that these referenced documents be filed under seal in this case.

When she was referred to secondary inspection, Ms. Ortega had two cell phones in her possession, one of which was used by N.Z.  *Id*.  CBP Chief Eric Geddry approved a basic examination of Plaintiffs' cell phones which was conducted from 9:45 a.m. to 11:30 a.m.  *Id*.  An advanced examination of Ms. Ortega's cell phone was approved by Acting Assistant Port Director (AAPD) Jason Jalbert based upon the intelligence provided by the DEA that she was suspected of smuggling narcotics; the advanced search was conducted from 11:30 a.m. to 11:40 a.m.  *Id*.  After the search of Ms. Ortega's electronics was completed, she departed secondary inspection with her daughter at 12:06 p.m.  *Id*.

The TECS lookout identifying Ms. Ortega as a potential narcotics smuggler remained in place on September 8, 2019, as Ms. Ortega and a traveling companion, Rosa Taveras Gomez, returned to the United States from the DR.  (TECS Report at GOV000013-14, 22-23).  Ms. Ortega was referred to secondary inspection where a basic secondary exam and pat-down search was conducted.  *Id*.  CBP Officer Jessica Croall performed the pat-down of Ms. Ortega, which was witnessed by CBP Officer Mary Davison, and approved by Acting Supervisory CBP Officer Carrie Acosta.  *Id*.  Ms. Ortega's pat-down lasted three minutes.  *Id*.

On August 20, 2020, Ms. Ortega was referred to immigration as she re-entered the United States from the DR with N.Z.  (TECS Report at GOV000017-18, 24-25).  Ms. Ortega continued to be suspected of being "a possible internal trafficker" based on intelligence from the DEA, and on that date she was traveling with $1,400.  *Id*.  CBP Officer Ignacio Tauroni requested a pat-down search which was approved by Supervisory CBP Officer Daniel Ouellette.  Officer Sydor conducted the pat-down, but it was stopped after two minutes because Ms. Ortega refused to cooperate.  *Id*.  Officer Tauroni was called, and after he explained the proper procedure for a pat-

down to Ms. Ortega, she complied and allowed Officer Sydor to complete a pat-down search which lasted four minutes.  CBP Officer Kimberly Carroll served as a witness.  *Id*.

## II.    ARGUMENT

Plaintiffs seek to compel disclosure of (1) the *substance* of any intelligence supporting the DEA's suspicion that Ms. Ortega was a potential narcotics smuggler; (2) the *substance* of phone calls between the DEA and other federal agencies regarding that suspicion; and (3) the TECS lookout itself.  *See* Pl. Supp. Briefing at 1-2 (emphasis added).  Plaintiffs claim that the basis for the DEA's suspicion is discoverable and relevant to their claims brought pursuant to the Federal Tort Claims Act (FTCA), as well as their Fourth Amendment claims against the U.S. Department of Homeland Security (DHS), CBP, and CBP officers and supervisors. [4]

Defendants respectfully request that this Court deny Plaintiffs' motion to compel discovery of the basis and substance of the DEA's investigation identifying Ms. Ortega as a potential internal carrier of narcotics.  Plaintiffs' claims for money damages against the United States under the FTCA allege negligence and state law torts arising out of conduct allegedly committed by individual CBP officers.  *See* Am. Compl., ECF No. 33, at Counts 10-21.  Plaintiffs' remaining claims under the Fourth and Fifth Amendments of the United States Constitution survived Defendants' motion to dismiss insofar as they seek declaratory or injunctive relief, and similarly are based upon the conduct of individual CBP officers during Plaintiffs' secondary inspection at Logan Airport.  Plaintiffs' Complaint does not allege misconduct by the DEA, nor does it allege misconduct by any DEA agent.  To the contrary, all actions at issue in this case concern actions

---

[4] Plaintiffs' Fourth Amendment claims against Defendants for monetary damages have been dismissed; only Plaintiffs' request for declaratory and injunctive relief remain.  (ECF No. 31, 33, 77).

that took place in secondary inspection at Logan Airport when CBP officers conducted a partial body search and/or pat-down search of Ms. Ortega.   Thus, although Ms. Ortega's referral to secondary inspection at Logan Airport was based on DEA intelligence that Ms. Ortega was suspected of being an internal drug smuggler, the events at issue in this case as relevant to Plaintiffs' motion to compel involve CBP officers' search of Ms. Ortega and her electronic devices.   As such, the basis and substance of a DEA investigation into drug trafficking is not relevant nor is it within the scope of discovery as defined by Fed. R. Civ. P. 26; but even if it were, it is protected from disclosure by the law enforcement privilege.   Plaintiffs' motion to compel this information must be denied.

### A.    Legal Standard Applicable To CBP Officers' Search Of Ms. Ortega

Logan Airport is an international airport, which is the "functional equivalent" of an international border.   *United States v. Molina-Gómez*, 781 F.3d 13, 19 (1st Cir. 2015) (case citations omitted); *Almeida-Sanchez v. United States*, 413 U.S. 266, 272-73 (1973).   "Under the border search exception, 'routine searches of the persons and effects of entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant.'"   *Molina-Gómez*, 781 F.3d at 19 (citing *United States v. Montoya de Hernández*, 473 U.S. 531, 538 (1985); *United States v. Braks*, 842 F.2d 509, 514 (1st Cir.1988) ("The First Circuit standard for routine border searches is the 'no suspicion' standard.")).

"Agents may perform routine searches at the border without reasonable suspicion." *Alasaad v. Mayorkas*, 988 F.3d 8, 18 (1st Cir. 2021) (case citations and internal quotations omitted).   "Under the 'no suspicion' standard applicable to routine border searches, a customs officer may search an individual based on subjective suspicion alone, or even on [a] random basis." *United States v. Uricoechea-Casallas*, 946 F.2d 162, 166 (1st Cir. 1991) (case citations omitted).

A pat-down search is a routine border search for which neither probable cause nor reasonable suspicion is required. *Molina- Gómez*, 781 F.3d at 19 (pat-downs, searching luggage, opening bottles of liquor and testing contents deemed to be routine searches); *Braks*, 842 F.2d at 514 (requiring female passenger at border to lift skirt was routine search); *United States v. Beras*, 183 F.3d 22, 26 (1st Cir. 1999) (routine border searches are not subject to reasonable suspicion, probable cause, or warrant).

"Non-routine" searches, however, "must be grounded on reasonable suspicion." *Alasaad*, 988 F.3d at 18 (citing *Molina-Gómez*, 781 F.3d at 19); *Braks*, 842 F.2d at 513-14). "Whether a border search is routine or non-routine depends on an assessment of the facts of the case," *id.*, and "often depends on the degree of invasiveness associated with the search." *Molina-Gómez*, 781 F.3d at 19 (case citations omitted). When a search is not routine, the reasonable suspicion standard applies. *Uricoechea-Casallas*, 946 F.2d at 166 (citing *United States v. Wardlaw*, 576 F.2d 932 (1st Cir. 1978) (strip search not routine)); *Molina-Gómez*, 781 F.3d at 19 (strip and body cavity searches and searches of property that are destructive are not routine). "Under this standard, a border search of an individual's person is lawful if the government can demonstrate some objective, articulable facts that justify the intrusion as to the particular person and place searched." *Id.* (citing *Braks*, 842 F.2d at 513 (internal quotations omitted)).

Neither a warrant nor probable cause is required for a border search of electronic devices. *Alasaad*, 988 F.3d at 18.

B. **The Substance And Basis For The DEA's Suspicion That Ms. Ortega Was Smuggling Narcotics Is Not Relevant To A Routine Pat-Down Search For Which No Suspicion Is Required**

For each occasion that Ms. Ortega was referred to secondary inspection at Logan Airport, no suspicion was required for CBP officers to conduct a pat-down search of her because she was

entering the United States at Logan Airport, the functional equivalent of an international border. *Molina- Gómez*, 781 F.3d at 19.   CBP's Personal Search Handbook defines a pat-down search as a law enforcement tool used to search for contraband or material evidence hidden on a person's body.  (CBP Personal Search Handbook at GOV000671, 000701).   CBP policy requires that "at least one articulable fact be present" before conducting a pat-down search.  *Id*.  A TECS lookout constitutes an articulable fact.  *Id*.

Here, based upon the TECS lookout entered for Plaintiffs, CBP officers referred Plaintiffs to secondary inspection and conducted a pat-down search of Ms. Ortega on April 27, 2019, September 8, 2019, and August 20, 2020.  (TECS Report at GOV000014, 18-21, 22-25).[5]  In discovery, Defendants have produced the names of the CBP officers who conducted and approved Ms. Ortega's pat-down search, TECS law enforcement system documents disclosing the existence of the TECS lookout, a summary of DEA intelligence to CBP identifying Ms. Ortega as a possible internal narcotics smuggler, correspondence between the DEA and CBP, and details of Plaintiffs' pat-down search.[6]

Further disclosure of the substance of the DEA's investigation or communications with other law enforcement agencies regarding the DEA's suspicion that Ms. Ortega was identified as someone who could be an internal drug smuggler is beyond the scope of discoverable information set forth in Fed. R. Civ. P. 26 and is further protected from disclosure by the law enforcement privilege.  *See Jenkins v. State of Rhode Island State Police Dept.*, No. CA 04-453S, 2006 WL

---

[5] A partial body search of Ms. Ortega was also conducted on this date (TECS Report at GOV000019-21).  Defendants' opposition to Plaintiffs' motion to compel with regard to this search is discussed more fully at Section C.

[6] *See* TECS Report at GOV000010-25, and GOV000057-511 (email correspondence).

1371644 (D. RI May 15, 2006) (noting that law enforcement privilege recognizes a privilege for documents that would reveal law enforcement investigative techniques or sources) (citing *Ass'n for Reduction of Violence v. Hall*, 734 F.2d 63, 65-66 (1st Cir. 1984)) (quotations omitted); *see also Puerto Rico v. United States*, 490 F.3d 50, 64 (1st Cir. 2007) (recognizing a "qualified privilege for law enforcement techniques and procedures").  The details of the DEA's investigation and suspicion of Ms. Ortega as a possible internal drug smuggler is not relevant to Plaintiffs' claims that CBP officers who conducted a pat-down or partial body search of Ms. Ortega committed misconduct during the search.  Nor is the information that Plaintiffs seek – the basis for the DEA's suspicion that Ms. Ortega was smuggling narcotics – relevant where no suspicion whatsoever was required to conduct a routine, pat-down search of Ms. Ortega as she entered the United States at Logan Airport, and even if a TECS lookout had not been instituted at the behest of the DEA.[7]  *See e.g. Alasaad*, 988 F.3d at 18.  Put another way, even without the DEA's investigation and suspicion that Ms. Ortega may be smuggling drugs, CBP officers could permissibly stop Ms. Ortega and conduct a routine, pat-down search of her without any level of suspicion as she entered the United States.

For these reasons, Plaintiffs' motion to compel the basis and substance of the DEA investigation must be denied.

---

[7] Even if this information were relevant, however, the substance and basis for the DEA's investigation and suspicion that Ms. Ortega was trafficking narcotics is protected from disclosure by the law enforcement privilege, as further set forth in Section C.  *Farry v. City of Pawtucket*, C.A. No. 08-325S, 2009 WL 792900 (D. RI Mar. 24, 2009); *Mauti v. Scuncio*, C.A. No. 08-054S, 2009 WL 10674195, *2 (D. RI June 10, 2009) (investigation notes properly withheld pursuant to the law enforcement privilege).

**C.      Reasonable Suspicion Existed For CBP Officers' Partial Body Search Of Ms. Ortega On April 27, 2019**

As set forth above, on April 27, 2019, as Plaintiffs entered the United States at Logan Airport they were referred to secondary inspection for an interview and baggage exam based upon intelligence from the DEA that Ms. Ortega may be an internal drug smuggler.  (TECS Report at GOV000010-12, 19-20).  Ms. Ortega was escorted to a private inspection room where Officer Sydor conducted a two-minute pat-down search that was witnessed by Officer Downey.  (TECS Report at GOV000019, 21).  Ms. Ortega's jeans were too thick and too tight, preventing a complete pat-down search.  *Id*.  Based upon DEA intelligence (the TECS lookout), for officer safety, and due to the officers' physical observations of Ms. Ortega, a partial body search was requested in order to search Ms. Ortega's groin area.  *Id*.  Supervisory CBP Officer Brett Sweet authorized the search, which lasted three minutes – from 10:29 a.m. to 10:32 a.m.  (TECS Report at GOV000019, 21, 754).

CBP's Personal Search Handbook defines a partial body search as "the removal of some of the clothing by a person to recover material evidence reasonably suspected to be concealed on the body."  (CBP Personal Search Handbook at GOV000674).  A partial body search may be conducted by a CBP officer after a pat-down search, and requires reasonable suspicion and supervisory approval.  *Id*.  During a partial body search, only clothing covering the particular area of the body under suspicion may be removed.  *Id*.  Officers may visually examine the unclothed portion of the person's body, and may ask the person being searched to manipulate her own body to permit an adequate visual examination.  *Id.*  Visual examination of the exterior skin area around the anus or vagina is not considered to be a cavity search.  *Id*.

Reasonable suspicion for a partial body search may be based upon the officer's training, experience, subject-matter expertise, knowledge of smuggling trends and methods, and

intelligence information provided by other CBP officers or law enforcement sources, such as the DEA.  (CBP Personal Search Handbook at GOV000656).   Here, Defendants produced the documents setting forth the basis by which a partial body search of Ms. Ortega was requested and conducted, including that:  CBP officers were aware of the DEA's intelligence and the TECS lookout; Ms. Ortega was suspected of smuggling narcotics; and a pat-down search of Ms. Ortega's groin area could not be accomplished because of her clothing.  CBP instructs its officers that intelligence from another law enforcement officer, including the DEA, is one basis by which to determine whether to conduct a personal search, and may be considered by CBP officers in forming reasonable suspicion.  (CBP Personal Search Handbook at GOV000656-657, 661).

Defendants produced TECS law enforcement reports in this case, as Plaintiffs admit.  CBP requires that "[t]he TECS reports must contain the objective, articulable facts that support the particular search or detention in the narrative."  (CBP Personal Search Handbook at GOV000666). Thus, the TECS reports are expected to support the basis for the partial body search of Ms. Ortega, and not the DEA information that Plaintiffs seek to compel.  To the contrary, the *basis* for the DEA agent's request that a TECS lookout be placed is not relevant:  the TECS lookout provides CBP officers with reasonable suspicion to request a pat-down search, and the TECS reports detail the facts and basis for CBP officers' request for and approval of a partial body search.  *Id*.

At issue in this case is Plaintiffs' claim that CBP officers committed misconduct during Ms. Ortega's partial body search.  Yet, they ask this Court to compel disclosure of the basis and substance of the DEA's narcotics investigation involving Ms. Ortega.  CBP officers' alleged misconduct during Ms. Ortega's search bears no rational relation or relevance to the substance of the DEA's narcotics investigation identifying Ms. Ortega as a possible smuggler.  In response to Plaintiffs' discovery requests, Defendants produced TECS reports detailing Ms. Ortega's

encounters with CBP officers, the basis for her partial body search, email correspondence between the DEA and CBP regarding the identification of Ms. Ortega as a possible smuggler, and documents setting out the background information resulting in institution of the TECS lookout.[8]

For these reasons, Plaintiffs' motion to compel information regarding the DEA's investigation must be denied. The information Plaintiffs seek to compel is neither relevant to their claims against Defendants, nor within the scope of permissible discovery permitted by Fed. R. Civ. P. 26. As set forth in Defendants' Opposition to Plaintiff Neisa Ortega's Motion to Compel (ECF No. 63), law enforcement officers' reasons for referring Plaintiffs to secondary inspection, the officers' actions after Plaintiffs' referral and the reasons for their actions, information that law enforcement received and communicated with regard to Plaintiffs' referral, search and detention, and the bases upon which law enforcement officers made decisions concerning Plaintiffs' inspection, search and detention is protected from disclosure by the law enforcement privilege.

"Federal case law recognizes a privilege for documents that would tend to reveal law enforcement investigative techniques or sources." *Jenkins,* 2006 WL 1371644 at *1; *Puerto Rico v. United States*, 490 F.3d at 64. "When particular documents have been determined to be covered by a qualified privilege, a party seeking discovery of those documents must make a threshold showing of need, amounting to more than mere speculation." *Id*. Plaintiffs fail to make any showing whatsoever that the bases for their referral to secondary inspection has "any direct relevance to the claims made in this case;" namely, that CBP officers conducting a pat-down and/or

---

[8] Defendants have agreed to disclose the name of the primary DEA Special Agent involved with the TECS lookout resulting in Ms. Ortega's referral to secondary inspection, and communicated that agreement to Plaintiffs' counsel on April 1, 2023. Defendants are in the process of un-redacting documents to produce to Plaintiffs pursuant to the Protective Order entered in this case.

partial body search of Ms. Ortega allegedly assaulted her, and improperly separated N.Z. from Ms. Ortega and questioned her.  *See e.g. Farry v. City of Pawtucket*, C.A. No. 08-325S, 2009 WL 792900 (D. RI Mar. 24, 2009); *Mauti v. Scuncio*, C.A. No. 08-054S, 2009 WL 10674195, *2 (D. RI June 10, 2009) (investigation notes properly withheld pursuant to the law enforcement privilege).  Nor does Plaintiffs' Complaint claim that the alleged misconduct committed by CBP officers was related in any way to the DEA and its investigation identifying Ms. Ortega as a possible internal smuggler.  To the contrary, Plaintiffs offer no more than mere speculation to support their motion to compel, and this Court should deny their motion.

As a general matter, the disclosure of details and the substance of a DEA investigation, the bases upon which travelers are referred to secondary inspection, and the details of and processes by which law enforcement officers investigate persons who are suspected of illegal activity clearly would impair law enforcement efforts, disclose law enforcement means, methods, and techniques, could interfere with ongoing criminal investigations or prosecutions, or reveal investigative or intelligence gathering and dissemination techniques, the effectiveness of which would thereby be impaired if disclosed.  Such disclosure undoubtedly would be harmful to the public interest, and Plaintiffs' need for the requested information "is greatly outweighed by the government's need to keep it secret."  *United States v. Stepus*, No. 3:15-cr-30028-MGM-1, 2018 WL 1257804, *3 (D. Mass. Mar. 12, 2018).  The information Plaintiffs seek to compel would tend to reveal law enforcement investigative techniques or sources and should not be disclosed.  *Estrada v. Rhode Island*, No. CA 07-010ML, 2007 WL 9677244, *3 (D. RI May 10, 2007) (policies and procedures for questioning and requesting identification from passengers, removing or transporting operators or passengers from a motor vehicle, and arresting, detaining or taking action relative to person suspected of being illegal immigrants protected by law enforcement privilege) (case citations

omitted); *see also, Prudential Ins. Co. of America v. Menard*, No. CA 06-395T, 2007 WL 3174053, *3 (D. RI Oct. 29, 2007) (citing *Puerto Rico v. United States*, 490 F.3d at 68 ("Public disclosure of the names of FBI agents and other law enforcement personnel could subject them to embarrassment and harassment in the conduct of their official duties and personal affairs.") (quoting *Massey v. F.B.I.*, 3 F.3d 620, 624 (2nd Cir.1993)); *id.* ("federal law enforcement officials have the right to be protected against public disclosure of their participation in law enforcement investigations") (quoting *Jones v. F.B.I.*, 41 F.3d 238, 246–47 (6th Cir.1994) (quoting *Ingle v. Dep't of Justice*, 698 F.2d 259, 269 (6th Cir.1983))).

"[T]he privilege for investigatory materials is rooted in common sense as well as common law," and "law enforcement operations cannot be effective if conducted in full public view." *Puerto Rico v. United States*, 490 F.3d at 62-63 (quoting *Black v. Sheraton Corp. of Am.*, 564 F.2d 531, 542, 545 (D.C. Cir. 1977)). "The purpose of this privilege is to prevent disclosure of law enforcement techniques and procedures, to preserve the confidentiality of sources, to protect witness and law enforcement personnel, to safeguard the privacy of individuals involved in an investigation, and otherwise to prevent interference with an investigation." *Id.* (citing *In re Department of Investigation of the City of New York,* 856 F.2d 481, 483-84 (2d Cir. 1988)). The law enforcement privilege has been found to apply to "information about ongoing criminal investigations – including investigative leads, law enforcement methods and techniques, internal investigative memoranda, and identifying information relating to witnesses and law enforcement personnel, including undercover operatives." *Id.* (citing *In re U.S. Dep't of Homeland Sec.,* 459 F.3d 565, 568-569 (5th Cir. 2006)).

The information that Plaintiffs seek – unredacted law enforcement reports and documents and information concerning law enforcement investigations and the bases upon which Plaintiffs

were referred for further inspection at Logan Airport – falls squarely within the law enforcement privilege.  Moreover, the basis and substance of the DEA's investigation identifying Ms. Ortega as a potential internal narcotics smuggler is not relevant or proportional to the needs of a case alleging misconduct by CBP officers during a pat-down or partial body search of Plaintiffs, as required by Fed. R. Civ. P. 26.  For these reasons, Defendants respectfully request this Court deny Plaintiffs' motion to compel.

### III.   CONCLUSION

WHEREFORE, for the reasons set forth herein and in Defendants' Opposition to Plaintiffs' Motion to Compel (ECF No. 63), Defendants respectfully request this Court deny Plaintiffs' Motion to Compel Production of Documents and Responses to Interrogatories.

Respectfully submitted,

RACHAEL S. ROLLINS
United States Attorney

By:   /s/ Eve A. Piemonte
Eve A. Piemonte
Assistant United States Attorney
United States Attorney's Office
John J. Moakley U.S. Courthouse
1 Courthouse Way, Suite 9200
Boston, MA  02210
(617) 748-3369
Dated: April 21, 2023          Eve.Piemonte@usdoj.gov

### CERTIFICATE OF SERVICE

I, Eve A. Piemonte, Assistant United States Attorney, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

/s/ Eve A. Piemonte
Eve A. Piemonte
Dated: April 21, 2023          Assistant United States Attorney